Filed 12/2/21  In re K.L. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| In re K.L., a Person Coming Under the Juvenile Court Law. |  |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>J.B.,<br><br>    Defendant and Appellant. | E076980<br><br>(Super.Ct.No. SWJ2100171)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County. Michael J. Rushton,

Judge. Affirmed in part as modified; reversed in part.

Monica Vogelmann, under appointment by the Court of Appeal, for Defendant

and Appellant.

Gregory P. Priamos, County Counsel, and James E. Brown, Anna M. Marchand,

and Julie Koons Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

1

J.B. (father) appeals the juvenile court's jurisdictional finding that his one-year-old daughter is at risk of substantial harm due to his failure to protect her from mother's abusive boyfriend and to provide adequate support. (Welf. and Inst. Code, § 300, subds. (b) & (g), unlabeled statutory citations refer to this code.) He argues the findings lack evidentiary support because he was unaware of the abusive nature of mother's relationship at the time of detention and, since detention, has been the child's sole caretaker. We agree with father and therefore reverse the two jurisdictional findings against him.

# I

## FACTS

A. *The Dependency Petition and Detention*

The subject of this dependency is father's one-year-old daughter, K.L., who was living with her biological mother in April 2021 when she came to the attention of the Riverside County Department of Public Social Services (the department) due to a domestic violence incident between mother and her boyfriend, Jose. Mother and father were not married. Mother had been with Jose for three years, and, at some point after K.L.'s birth, Jose had taken a paternity test and learned he was not the child's biological father. In addition to K.L., mother was also caring for the child's three cousins, all of whom were under 10 years of age.

On April 3, 2021, the department received an immediate response referral regarding allegations of general neglect. The report alleged that while they were driving

2

in the car with the children, Jose had hit mother and fired a gun out of the window. A social worker responded to mother's home to interview her about the alleged incident. Mother—who had visible injuries to her face and arm—confirmed the domestic violence incident. She said that as they were driving the previous evening Jose started a fight about her having K.L. with another man. During his tirade, he brandished a handgun and fired it out the window, then hit mother with the back of his hand. Mother said K.L.'s cousins yelled at Jose to stop, and she asked him to pull over several times. Eventually he did pull over, she and the children got out, and he drove off. Mother said she then called the police, and also asked father to pick her up and take her and the children to a friend's house.

Mother told the social worker this wasn't the first time Jose had been abusive with her and recounted two domestic violence incidents from August 2020. In the first incident (for which the children were not present), Jose tried to hang himself after arguing with her. The second incident took place three days later when Jose grabbed and pushed her during another argument. Mother said she had called the police after that incident, but Jose had left the home by the time they arrived.

Mother also said she had broken up with Jose after those incidents and sought a temporary restraining order (TRO) against him, but Jose was never served with the TRO and she didn't follow through with obtaining a permanent restraining order. She said she and Jose reconciled and started dating again in February 2021.

The social worker's interviews with K.L.'s cousins confirmed that Jose was physically abusive towards mother in their presence. One of the cousins said mother had a black eye because Jose had hit her six times with both an open and closed fist. The cousin said he had seen mother and Jose physically fight at home, and when they did so he would hide in his room. He said mother was sometimes holding K.L. during the fights. The other two cousins gave similar accounts, saying Jose had hit mother on numerous occasions. One of the cousins said he sometimes saw Jose's gun in the center console of mother's car.

The social worker also interviewed father over the phone. Father told the social worker that mother had called him the day before after having been "involved in a domestic dispute." He said he did not know the details of the dispute because he hadn't asked mother—he "did not want to stick his nose in [her] business." He said he tries to be a source of emotional support for mother without asking her the particulars of what goes on in her romantic relationships.

When the social worker asked him if he knew Jose had used a gun during the incident, father said no. When she told father Jose had used a gun and asked if father had any concerns, he said he did "not feel there is a huge concern at the time" and would wait and see if mother was going to file a restraining order against Jose.

There were no custody orders regarding K.L. and father routinely visited her. He told the social worker that he wasn't currently intending to take K.L. away from mother

but he was intending to remain a source of emotional support for mother so they could co-parent their daughter.

Based on the April 3 incident, the department filed a dependency petition on behalf of K.L. alleging she fell under section 300, subdivisions (b) (failure to protect) and (g) (failure to provide support). Most of petition's allegations concerned mother, but the petition also alleged father failed to protect K.L. from abuse and neglect because "he *knew or reasonably should have known* about the mother's ongoing domestic violence with her boyfriend and continues to allow the mother to be the primary caretaker." (Italics added.) The petition also alleged father failed to provide K.L. with adequate care and support.

The juvenile court held the detention hearing on April 7, 2021. Father's counsel told the court that the social worker had misunderstood father during their phone interview because he "very much wants his child to be in his care and does have a suitable home." He requested the detention hearing be trailed so his home could be assessed for placement. The judge granted father's request and detained K.L. with a relative in the meantime.

The department completed the home assessment two days later, finding father's home was appropriate, he had the necessary provisions to care for his one-year-old daughter, and there were no safety concerns. The judge detained K.L. in father's custody. About a week later, on April 12, Jose was arrested and held without bail.

5

B. *Jurisdiction and Disposition*

On April 27, 2021, the department submitted a report recommending K.L. remain in father's custody with the provision of family maintenance services. The social worker interviewed father and mother about the allegations in the petition. Mother disputed the allegation that father knew or should have known about the domestic violence between her and Jose. She said the April 3 incident was the first fight that she told father about. She also disputed the allegation that father failed to provide adequate support for K.L. She said that though he wasn't a member of the household and didn't pay child support, he did provide support for K.L. in the form of gifts and diapers.

Father also disputed the two allegations against him. He said he had no idea there were any domestic violence issues between mother and Jose until the April 3 incident. He said he knew mother and Jose would argue, but he had no idea their disputes would become physical. He said he knew about mother's TRO request, but thought she had sought the order because " 'they broke up and he kept coming around.' " He also said that, until April 3, he had no idea mother and Jose had gotten back together after their 2020 breakup resulting in mother's TRO request.

According to father, when he picked mother up on April 3 after the incident, she did not tell him a gun had been involved. He said he would never minimize domestic violence, emphasizing that it's " 'wrong in any form and there is no sweeping that under the rug.' " He said that had he known Jose was violent he " 'would have offered to help' " and " 'would have called the cops [him]self.' " He said it was possible mother had

hidden the physical abuse from him because she knew he would have taken her to court to get custody of K.L. He also said he supports K.L. with anything she needs financially, including " 'clothes, diapers, walkers, and birthdays.' "

The court held the jurisdiction and disposition hearing on April 27, 2021. Mother submitted on the petition, but father contested the petition and offered stipulated testimony to the following effect: he had no idea about the nature of the disputes between mother and Jose and would have intervened if he had. The judge found various allegations against mother true and also found true the two allegations against father, took jurisdiction over K.L., continued her in father's custody, and ordered family maintenance services for father.

Father filed a timely appeal challenging the sufficiency of the evidence supporting the jurisdictional findings against him.

## II

## ANALYSIS

### A. *Justiciability*

As an initial matter, we address the department's contention that we should dismiss this appeal on the ground father's arguments are not justiciable. They point out that father doesn't contest the jurisdictional findings against mother, nor the judge's dispositional order.

It is true the department "is not required to prove two petitions, one against [one parent] and one against the [other parent], in order for the court to properly sustain a

7

petition or adjudicate a dependency." (*In re La Shonda B.* (1979) 95 Cal.App.3d 593, 599.) As such, "a jurisdictional finding good against one parent is good against both." (*In re Alysha S.* (1996) 51 Cal.App.4th 393, 397.) And for that reason, "an appellate court may decline to address the evidentiary support for any remaining jurisdictional findings once a single finding has been found to be supported by the evidence," because no matter the outcome, the juvenile court will retain jurisdiction against both parents. (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1492.)

However, "[W]e generally will exercise our discretion and reach the merits of a challenge to any jurisdictional finding when the finding (1) serves as the basis for dispositional orders that are also challenged on appeal [citation]; (2) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings [citations]; or (3) 'could have other consequences for [the appellant], beyond jurisdiction' [citation]." (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762-763.) Here, because the jurisdictional findings against father " ' "could potentially impact the current or future dependency proceedings," ' " we exercise our discretion to review the merits of his appeal. (*In re L.O.* (2021) 67 Cal.App.5th 227, 237-238, quoting *In re M.W.* (2015) 238 Cal.App.4th 1444, 1452.)

B.     *The Section 300, Subdivision* (*g*) *Finding is Not Supported by the Record*

As to father's challenge to the allegation based on section 300, subdivision (g), the department concedes there is insufficient evidence to support the finding that he failed to provide adequate care and support for K.L. We agree with the parties.

8

A child falls within section 300, subdivision (g), in four circumstances: (1) the child has been left without provision for his or her support, (2) physical custody has been voluntarily surrendered under Health and Safety Code section 1255.7, subdivision (g), and has not been reclaimed within the period specified in the statute, (3) the child's parent has been incarcerated or institutionalized, or (4) the " 'child has been left with a relative or other adult custodian who is unwilling or unable to provide for the child's care or support, the whereabouts of the parent is unknown, and reasonable efforts to locate the parent have been unsuccessful.' " (*In re E.A.* (2018) 24 Cal.App.5th 648, 661-662.) In order for a juvenile court to take jurisdiction over a child, one of these circumstances must exist at the time of the jurisdictional hearing. (*In re Aaron S.* (1991) 228 Cal.App.3d 202, 208.)

When reviewing jurisdictional findings in the face of an evidentiary challenge, " ' "we look to see if substantial evidence, contradicted or uncontradicted, supports them." ' " (*In re E.E.* (2020) 49 Cal.App.5th 195, 206.) " ' "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." ' " (*Ibid.*)

Here, it is undisputed that none of these circumstances existed at the time of the jurisdiction hearing because by that time K.L. had been placed with father. Thus, at the relevant time, father was K.L.'s primary caretaker. Because there was no evidence that

9

father wasn't properly caring for his daughter after the court placed her with him, his custodial status alone is dispositive. The true finding on the g-1 allegation is not supported by the record.

C.      *The Section 300, Subdivision (b) Finding is Not Supported by the Record*

We also agree with father that the true finding on the b-4 allegation against him is not supported by the record.

A juvenile court may take jurisdiction of a child under section 300, subdivision (b)(1), only if it finds by a preponderance of evidence that the " 'child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child.' " The social service agency bears the burden to demonstrate the following three elements: "(1) neglectful conduct, failure, or inability by the parent; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness." (*In re L.W.* (2019) 32 Cal.App.5th 840, 848.) " 'The basic question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm.' " (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1022, italics added.)

As an initial matter, we note that the juvenile court found the b-4 allegation true based on its observation that father "seemed like a guy that didn't want to be involved, didn't want to rock the boat, didn't want to get in the middle of what was going on with mom's relationship." The problem with this reasoning is that father's choice to give

10

mother privacy in her romantic relationship becomes a basis for jurisdiction only if he knew or should have known Jose was violent and dangerous, and we don't see enough evidence of that here.

On this record, there can be no dispute that (1) father learned of the severity of the April 3 incident only after the fact and from the social worker, and (2) ever since detention—and thus at the time of the jurisdiction hearing—father was protecting K.L. from the risk Jose posed by keeping his daughter away from mother and Jose. Given these undisputed facts, the only issue is whether there was sufficient evidence that father knew or should have known of the danger Jose posed *before* the April 3 incident and thus failed to protect K.L. from mother and Jose's domestic violence issues.

The department argues the record supports an inference that father should have known Jose posed a danger because he admitted to the social worker that he knew mother had sought a TRO against Jose. But such an inference overlooks the additional information father gave the social worker on the topic. Father explained that he thought the reason mother had sought a TRO was because Jose wouldn't leave her alone after she had broken up with him. And, importantly, father also told the social worker that he didn't know mother and Jose *had gotten back together* until she called him for help after the April 3 incident. Thus, even if he should have been suspicious of Jose due to the fact mother thought it necessary to seek a TRO, he believed that Jose was out of the picture after that. Because the record contains no evidence that could rebut father's explanation,

11

there is no basis to conclude that his knowledge of the TRO put him on constructive notice that Jose posed a threat to K.L. before the April 3 incident.

Next, the department argues the fact father didn't ask mother follow-up questions about the April 3 incident after he picked her up constitutes sufficient evidence to support the true finding. They argue that father's failure to obtain the details of the fight shows he was purposely keeping himself in the dark about the nature of mother's relationship with Jose. They also point out that when the social worker interviewed mother the day after the incident, she had visible bruises. This, they claim, supports an inference that father too had seen the bruises. Again, these interpretations of the record require us to ignore the unrebutted explanations father gave the social worker and the juvenile court. He said he never saw any signs that Jose was physically abusive towards mother, including on April 3 when he picked her up. The fact the social worker saw bruises a day later does not mean they were visible moments after the incident when father saw her. Furthermore, the record provides no basis for concluding that father was not telling the truth when he said he didn't ask mother follow-up questions because he didn't want to pry into her personal life. That would not be an acceptable justification for failing to ask further questions *if he had known a gun was involved*, but on that point the record is undisputed—he did not know Jose had fired a gun. As far as father knew, Jose and mother were a couple who argued a lot, and they had been arguing that evening. Father was not privy to what went on with mother and Jose at home. K.L. lived with them but

12

was too young to talk and father didn't have a relationship with K.L.'s cousins who saw the abuse firsthand.

Lastly, while the social worker wrote in her report that father's response to learning Jose had fired a gun during the April 3 incident was that it wasn't a "huge concern," the next time she talked to him he conveyed it was in fact a very significant concern for him. He said he would never minimize any form of violence or physical abuse and had he know what Jose had done to mother on April 3 he would have intervened. Given the fact there had been a misunderstanding during father's first interview about whether he wanted K.L. placed with him, it's not unreasonable to conclude there had also been a misunderstanding around the subject of the gun. As we read the record, it's entirely possible the social worker misheard father or father misheard the question and was instead elaborating on why he hadn't felt the need to ask mother questions about her relationship with Jose.

The bottom line is that there was no evidence that father knew or should have known Jose was physically abusive until April 3, when the department intervened, and there is also nothing in the record to suggest that after he learned about the gun, he failed to protect K.L. Indeed, the juvenile court found him a safe and suitable caregiver when it detained K.L. with him leading up to the jurisdiction and disposition hearing. Absent any evidence that father would allow his daughter to stay with mother—against the court's order—the b-4 allegation against him cannot stand.

# III

# DISPOSITION

We reverse the jurisdictional findings against father. In all other respects, we affirm the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH _____
                                    J.

We concur:

McKINSTER _____
            Acting P. J.

RAPHAEL _____
                J.

14