Filed 2/4/26  In re A.M. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.M., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E086587 |
| Plaintiff and Respondent, | (Super.Ct.No. DPSW2400417) |
| v. | OPINION |
| F.G., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Sean P. Crandell, Judge.  Affirmed.

Sarah Vaona, under appointment by the Court of Appeal, for Defendant and Appellant.

Minh C. Tran, County Counsel, Teresa K.B. Beecham and Julie K. Jarvi, Deputy County Counsel for Plaintiff and Respondent.

1

In the jurisdiction phase of the dependency hearing, the juvenile court found there was substantial risk of A.M. (Minor) suffering serious physical harm due to defendant and appellant F.G.'s (Father) failure to protect Minor.  (Welf. & Inst. Code, § 300, subd. (b)(1)(A).)[1]  In the disposition phase, the juvenile court denied Father's request to have Minor placed in his care.  (§ 361.2.)

Father raises four issues on appeal.  First, Father contends the jurisdiction finding is not supported by substantial evidence.  Second, Father asserts the juvenile court applied the wrong statute in the disposition phase.  Third, Father contends the detriment finding (§ 361.2) is not supported by substantial evidence.  Fourth, Father asserts the inquiry into whether Minor might be an Indian child was inadequate.  We affirm.

**FACTS**

A.    <u>BACKGROUND</u>

Minor was born in December 2020.  Father was not present at Minor's birth and was not on her birth certificate.  Minor resided with Mother and Mother's boyfriend, M.L. (Boyfriend).  Minor referred to Boyfriend as "daddy."  Father visited Minor three times:  once when Minor was five months old, once at 11 months old, and on Minor's second birthday.

B.    <u>DETENTION</u>

In November 2024, Boyfriend argued with his 73-year-old grandmother and " 'head butted' [her] in the face."  Following that violence, while trying to evade law

_____

[1]  All further statutory references will be to the Welfare and Institutions Code unless otherwise indicated.

2

enforcement, Boyfriend drove a vehicle over 130 miles per hour, at night, with the headlights off. Minor was inside the vehicle without a child's car seat.

The Riverside County Department of Public Social Services (the Department) asked Father about filing for custody of Minor, but he declined because he was about to start a two-week military deployment. Father admitted knowing that Boyfriend was "unstable due to a previous investigation." In December 2024, the Department detained Minor.

      C.        <u>JURISDICTION AND DISPOSITION</u>

In January 2025, a paternity test revealed that Father was Minor's biological father. The Department scheduled a visit between Father and Minor for February 11, 2025, at the Department's office in Temecula. On the day of the visit, Father canceled due to the time it would take him to travel to Temecula from his home at Camp Pendelton.

Father had a telephonic visit with Minor. "When [Father] spoke, [Minor] made a confused face and stopped talking. She did not respond for the duration of the visit. After the call, [Minor] told the [foster parent] that was not her father. [Minor] seemed very confused as to who had been on the phone."

On March 25, 2025, the social worker visited Minor at her foster home. Minor held onto her foster parent's leg and hid behind her. When the social worker asked Minor "who her dad was, [Minor] shrugged her shoulders."

In April 2025, Father and Minor had two in-person visits at the Department's office. During the first visit, Father and Minor played together and had a good visit.

3

During the second visit, when Father entered the room, Minor "went to the corner and stayed there." Father became agitated and upset, which scared Minor's foster parent. Father asked the foster parent if Minor "was always like that." The foster parent explained that Minor was shy and typically acted in that manner "around people she did not know." "[Father] got really close to [Minor], saying 'Come on, why are you being like this[?]' [Father] went to grab [Minor's] feet to get her out of the corner. The [foster parent] intervened and excused herself and [Minor] to go to the bathroom. The [foster parent] indicated that the security guard heard and office staff had gotten [Minor] a blanket. [Minor] started crying and demanding to go home."

The next week Father canceled his visit because he broke his hand and could not drive. After that, for two and a half weeks, Father did not respond to the social worker's text messages. Because Father missed three consecutive visits, his visits were taken off the schedule.

The jurisdiction and disposition hearing took place in June 2025. The jurisdiction allegation against Father was: Father was not a member of Minor's household and he failed to provide Minor with adequate food, clothing, shelter, medical treatment, and/or protection. Father provided evidence of (1) having sent Mother money on multiple occasions via a cash app; (2) text messages between Father and Mother of Father seeking visits with Minor; and (3) photographs of Father with Minor. At the hearing, Father's attorney asserted that the allegation against Father should be found untrue because Father was "taking every step possible to provide [Minor] with . . . adequate support." Father's attorney argued that any failings on Father's part were

4

due to the military not giving Father "adequate time off base to handle these matters." Father's attorney contended that Father was a non-offending parent, and Minor should be placed in Father's custody under section 361.2.

The juvenile court found that Father had been "providing certain, perhaps, financial resources" to Mother for Minor and had sent text messages to Mother to try to visit Minor, but Father never took legal action to visit or take custody of Minor. The court found the allegation against Father to be true. The juvenile court determined it would not place Minor with Father due to "the circumstances in the most recent visitation."

## DISCUSSION

A.      UNDERLINE_JURISDICTION

Father contends that the jurisdiction finding against him is not supported by substantial evidence.

" 'In reviewing the jurisdictional findings and the disposition, we look to see if substantial evidence, contradicted or uncontradicted, supports them. [Citation.] In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.' " (*In re R.T.* (2017) 3 Cal.5th 622, 633.)

The allegation against Father was that Minor was at substantial risk of suffering serious physical harm due to Father's failure to protect Minor. (§ 300, subd. (b)(1)(A).) The relevant elements are (1) neglect, failure, or inability by Father; (2) harm or

substantial risk of harm to Minor; and (3) causation.  (*In re L.W.* (2019) 32 Cal.App.5th 840, 848.)

Father admitted knowing that Boyfriend was "unstable due to a previous investigation."  Despite that knowledge, Father did not seek to establish his paternity, did not pursue custody of Minor, and he did not visit Minor to check on her wellbeing.  While Minor was in the care of Mother and Boyfriend, Boyfriend evaded police by driving a vehicle at over 130 miles per hour, at night, with the headlights off.  Minor was inside the vehicle.

The foregoing evidence reflects that Father failed to protect Minor by doing nothing to try to remove Minor from the care of an unstable person.  Due to Father's inaction, Minor was in Boyfriend's care during a moment of erratic behavior when Boyfriend exposed Minor to a substantial risk of being physically harmed in a serious car crash.  Thus, substantial evidence supports the finding that Father's failure to protect Minor from Boyfriend created a substantial risk that Minor would suffer serious physical harm.  (§ 300, subd. (b)(1)(A).)

As to the future risk of harm, Father did not intend to take physical custody of Minor so as to protect her from any future erratic behavior on the part of Boyfriend.  Father resides at Camp Pendelton, and he said Minor could not live there with him.  Father intended for Minor to reside with Father's mother, in Los Angeles.  Father provided no evidence concerning his mother's ability to protect Minor should Mother and Boyfriend seek to contact Minor while Boyfriend was in an unstable condition.

For example, in June 2024, Mother and Minor were residing with Mother's family. "[M]other moved out with [Boyfriend] to an unknown address. On June 13, 2024, . . . [M]other and [Boyfriend] returned to the home in an attempt to sneak [Minor] out. [Minor] was in her aunt's room crying as she did not like [Boyfriend]. [Boyfriend] stated he had a 45 gun and threatened the family if they did not allow . . . [M]other and him to take [Minor]. No gun was observed however, [Boyfriend] started to lif[t] his shirt and appeared to be intending to take out a gun however, . . . [M]other lowered his shirt and they left the home without [Minor]. It was believed [Boyfriend] wanted . . . [M]other to take [Minor] as he wanted the money . . . [M]other got for [Minor]."

If a similar situation were to occur at Father's mother's home, it is unknown what Father's mother could do to protect Minor, and Father would likely be many miles away at Camp Pendelton unable to assist in protecting Minor. The evidence reflects that Minor is at substantial risk of suffering serious physical harm due to Father's failure to protect Minor.

Father contends, "There was no allegation that Father knew or should have known of [Minor]'s plight in Mother's care." The Department alleged that Father failed to protect Minor and included facts regarding Minor being in the car while Boyfriend drove over 130 miles per hour to evade law enforcement. The allegation that Father failed to protect Minor combined with the facts of Boyfriend's unsafe driving implies that Father had knowledge of Boyfriend's erratic behavior.

Father asserts that he "could not have obtained custody sooner, as he remained an alleged [f]ather until the juvenile court made orders otherwise." Contrary to Father's

7

position, prior to the Department's involvement Father could have pursued a voluntary declaration of parentage to establish himself as Minor's father. (Fam. Code, § 7573.)

In sum, the jurisdiction findings are supported by substantial evidence.

B.    DISPOSITION

    1.    *SECTION 361.2 VERSUS SECTION 361*

Father contends that he was "entitled to consideration for placement pursuant to section 361.2. The juvenile court erroneously removed custody of [Minor] from Father pursuant to section 361."

Under section 361.2, if there is a parent who was not residing with the child when the dependency conditions arose, and that parent wants custody of the child, then "the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd. (a).)

At the disposition hearing, Father cited section 361.2 and requested that Minor be placed in his care. The juvenile court denied Father's request citing "the circumstances in the most recent visitation." The juvenile court's comment implies that placing Minor with Father would be detrimental to Minor's emotional wellbeing, as demonstrated by their most recent visit. Thus, the juvenile court applied section 361.2

Section 361 pertains to removing a child from the physical custody of the parent with whom the child resided when the dependency petition was initiated. (§ 361, subd. (c).) Minor has never resided with Father, so section 361 would not apply to Father. Nevertheless, when the juvenile court was making its findings and orders, it said,

8

"[T]here is clear and convincing evidence of circumstances within Section 361 as to each parent. Physical custody of the children remains removed from their[2] respective parents." The juvenile court erred in making that comment regarding Father. However, the error is harmless given the juvenile court's comments applying section 361.2.

### 2. *DETRIMENT*

Father asserts the evidence does not support a finding of detriment (§ 361.2, subd. (a)), rather it reflects that "[Minor] and Father did not have a relationship."

During Father and Minor's last visit, Minor hid in the corner and repeatedly said she wanted to go home. Father became agitated and upset, which scared Minor's foster parent. "[Father] got really close to [Minor], saying 'Come on, why are you being like this[?]' [Father] went to grab [Minor's] feet to get her out of the corner. The [foster parent] intervened and excused herself and [Minor] to go to the bathroom. The [foster parent] indicated that the security guard heard and office staff had gotten [Minor] a blanket. [Minor] started crying and demanding to go home. The [foster parent] advised [the social worker] when [Father] got upset, [Minor] was covering her face because he got really close."

The foregoing evidence reflects more than the lack of a relationship. It establishes anger on the part of Father and fear on the part of Minor. Given the anger and fear, the juvenile court's emotional detriment finding (§ 361.2) is supported by substantial evidence.

---

**2** Minor's half-sibling is also part of the case in the juvenile court. Boyfriend is the father of Minor's half-sibling.

C.       INDIAN CHILD INQUIRY

1.       *FACTS*

The Department's inquiry of Minor's paternal family regarding whether Minor may be an Indian child included Father, Minor's paternal grandfather, and Minor's paternal grandmother. They all denied having Indian ancestry. Minor's paternal aunt and uncle resided with Minor's paternal grandmother. The Department did not ask the paternal aunt and uncle about possible Indian ancestry. The juvenile court found the Department conducted an adequate inquiry and the Indian Child Welfare Act of 1978 (25 U.S.C.A. § 1901 *et seq.*) (ICWA) did not apply.

2.       *ANALYSIS*

Father contends the juvenile court erred by finding the Department conducted an adequate ICWA inquiry because the Department failed to inquire of Minor's paternal aunt and uncle.

"At the first contact with the child and each family member, including extended family members, the county welfare department . . . has a duty to inquire whether that child is or may be an Indian child." (Welf. & Inst. Code, § 224.2, subd. (b)(1).) The definition of " 'extended family member' " includes the child's aunts and uncles who are at least 18 years old. (25 U.S.C.A. § 1903(2) & Welf. & Inst. Code, § 224.1, subd. (c)(1).)

Minor's paternal aunt's and uncle's ages are not in the record. They reside with their mother. Father was born in May 2003, which means he is 22 years old. Given that Father is 22, it is possible that his siblings are under 18 years old. Because we do not

know the ages of Minor's paternal aunt and uncle, we do not know if they meet the definition of extended family members. As a result, Father has failed to demonstrate an error occurred. (*In re Julian R.* (2009) 47 Cal.4th 487, 498-499 [appellant must affirmatively demonstrate error].) Because this case is ongoing, we encourage the Department to determine the ages of Minor's paternal aunt and uncle to clarify any obligation it may have to inquire of them.

## DISPOSITION

The disposition order is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER

J.

We concur:

RAMIREZ

P. J.

CODRINGTON

J.