Filed 6/2/23  In re J.M. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re J.M., a Person Coming Under the Juvenile Court Law. | B317841 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | Los Angeles County Super. Ct. No. 18CCJP01801B |
| Plaintiff and Respondent, | |
| v. | |
| H.M., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Marguerite D. Downing, Judge.  Reversed.

Michelle L. Jarvis, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and William D. Thetford, Principal Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

Father, H.M., appeals orders of the juvenile court (1) exercising jurisdiction over his daughter, J.M., under Welfare and Institutions Code[1] section 300, and (2) removing J.M. from his custody pursuant to section 361. We reverse.

**BACKGROUND**

The family is comprised of Father and J.M. Mother abandoned the family when J.M. was one and a half years old. Since mother left, Father has raised J.M. with help from paternal grandmother. This appeal arises from the second of two dependency proceedings.

The first proceeding began in 2018 when J.M. was four years old. Police were called to the family apartment following a neighbor's report that Father was inside yelling and screaming, which included a statement that he was going to "kill." When police arrived, they heard Father "ranting and screaming" and "making strange noises." Father initially denied that he had been ranting and screaming, and claimed that he had been asleep. However, when the officers told him that they heard him making noises from outside the apartment, Father "began laughing and joking." The officers entered the apartment and found multiple open beer cans while J.M. was sitting on her bed, clutching a blanket, and " 'scared out-of-her mind.' " Father was placed on a psychiatric hold, and the referral was promoted to a case with the Los Angeles County Department of Children and Family Services (DCFS).

The juvenile court found true and sustained the allegations under section 300, subdivision (b), that Father had "exhibited disruptiveness and uncontrollable behaviors which . . . resulted

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

in neighbor's reports, law enforcement intervention and involuntary hospitalization," and that "father suffers from anxiety and self-medicates with alcohol nightly while [J.M.] is in his care." The allegations continued, "father's disruptive behaviors, untreated anxiety and parenting under the influence of alcohol place [J.M.] at risk of harm."

The juvenile court ordered services for Father that included a substance abuse program, mental health services, and drug testing. Father successfully completed all ordered services. He stopped drinking, admitted that he had been drinking heavily due to stress, and developed healthy coping mechanisms. The juvenile court terminated jurisdiction at the end of 2019, granting sole legal and physical custody to Father. Mother's whereabouts remained unknown.

About two years later, in October 2021, DCFS received a new referral about the family, which led to the current proceedings. A neighbor reported hearing "several loud noises and yelling" from the family's apartment, and that it was "not the first time."[2] The neighbor claimed to have heard J.M. telling Father to "stop touching her and . . . her underwear" and asking Father "[w]hy [are you] doing this?" The neighbor believed that Father was under the influence of something because he responded to J.M. with slurred speech and laughter. The neighbor called 911, but police were unable to make contact with the family.

Two weeks after the referral, a social worker made an unannounced visit to Father's apartment. The social worker

[2]      A month earlier, the neighbor complained to the apartment manager about the noise coming from Father's apartment, after which, Father quieted down.

observed the home to be clean and tidy; adequately furnished; stocked with sufficient food, age appropriate toys, and clean linens; and found all utilities in working order. There were no visible safety hazards and no indication of drug or alcohol abuse in the home. While Father was upset that someone had called DCFS, he was otherwise cooperative, easy to engage, presented an appropriate affect, and displayed no visible signs of cognitive impairment or substance use. Father explained that his family was loud and that the apartment manager had expressed concern about noise coming from his apartment. Father denied any drug or alcohol use. Father also denied any criminal history, however, a database search revealed Father's criminal history included evading law enforcement, possession of drugs and alcohol, two DUI's, and reckless driving, with the last conviction occurring in 2005.

The social worker interviewed the apartment manager, who stated that she had not witnessed any abuse or neglect from Father, and that J.M. was always cheerful, talkative, and happy. She reported that neighbors complain about Father because he is loud and "can make a lot of noise." However, she stated that she had addressed that with Father and he is "trying to keep quiet."

The social worker next spoke with the principal of J.M.'s school who reported Father had been "aggressive" with him and his staff, but he had never observed any abuse or neglect with respect to J.M. He reported that J.M. has low average grades and average attendance, but that J.M. is "easy going and calm."

The social worker next spoke with J.M. who denied all forms of abuse and said she had never seen Father under the influence. She reported being well cared for in all respects and stated that Father is a "nice guy." J.M. reported that she always

4

has enough food to eat, is able to bathe and shower regularly, and always has access to clean, well-fitting clothes and shoes. She stated that she is never left unsupervised. The social worker "observed no marks or bruises indicative of abuse or neglectful parenting of the child."

The social worker spoke with J.M.'s pediatrician, who had last seen J.M. less than a year prior. The pediatrician reported no concerns of abuse or neglect, and that J.M. was up to date with physicals and immunizations.

About three weeks after the first social worker's set of interviews, another social worker reinterviewed Father. The social worker asked Father if he was willing to drug test, and Father said that he would. During this second interview, Father admitted that he "drinks a few glasses of wine nightly after [J.M.] goes to sleep but denie[d] any past or current alcohol or substance use or abuse."

The social worker interviewed paternal grandmother, who had no concerns about alcohol or substance abuse by Father. Nor had J.M. ever disclosed anything concerning to her. Paternal grandmother stated she sees the family every other night and they come to her home for dinner twice a week.

The social worker conducted a second interview with J.M.'s principal and asked him what he meant when he told the first social worker that Father was "aggressive." The principal explained he received five unrelated complaints about Father's behavior from other parents. The principal reported that, when Father is in the valet line to pick up J.M., he honks at people, plays his music very loud, and makes other parents feel uncomfortable and threatened. He also reported that Father makes "hand gestures in the car at people" and other parents had

complained that Father drives "erratically." The principal described the issues with Father as a "head scratcher," and that Father "presents as nervous and it appears like something is off with him." However, the principal was unsure if "it is just how Father is or if Father is on something." He had never gotten close enough to Father to smell or observe any alcohol. The principal also described Father as "obnoxious, irate, and an intense person," who "tries to create problems." For example, the principal got into an argument with Father about the school's policy, requiring parents to use a "QR code check-in process" to track their children's symptoms (presumably for COVID-19). Father initially refused to participate in the program, but later apologized for arguing with the principal over the matter. The principal had no concerns about J.M., observing her to be "well adjusted," "always clean," and "happy."

The social worker spoke to several of the family's neighbors, who lived in the same apartment complex. One neighbor was "stunned" at the allegations against Father. That neighbor considered him "loving and devoted" to J.M., had never seen him under the influence, and had no concerns about the family. She told the social worker that J.M. and Father appear to have a "great relationship."

Another neighbor, whose apartment was right next to the family's, had heard Father and J.M. yelling at each other. She reported the yelling "sound[ed] bad," and that one time she heard Father say, "I can't do this anymore" and J.M. responded "Shut up—[s]on of a bitch." She recorded the yelling, but the words on the recording were indiscernible. She had never heard anything that sounded like physical abuse and had never seen marks or bruises on J.M. aside from a small scratch. She had, however,

seen Father on multiple occasions in a state she described as "drunk or 'wasted' " and suspected Father might be driving drunk.

Another neighbor, who asked to remain anonymous for fear of retaliation, said that "there is something wrong with [the] Father" and J.M. needs "protection." She said another neighbor had told her she planned to "vouch for father" in the DCFS's investigation, but that neighbor lives farther from the family's apartment than the anonymous neighbor. The anonymous neighbor said, from what she could hear from outside the family apartment, "father uses a lot of profanity towards [J.M.] and [J.M.] constantly . . . tell[s] father to stop." She claims to have heard J.M. tell Father "I hate you." She reported the yelling usually happens between midnight and 1:00 a.m.

A few days after speaking with the neighbors, the social worker interviewed J.M. a second time at her school. J.M. reiterated that Father does not mistreat her in any way and that he is a "nice guy." She reported being well cared for at home and having no fear of Father. She denied that she had ever seen Father "drink anything that made him act different" or Father "act unlike himself." The social worker noted a "very tiny scratch" on J.M.'s face. J.M. could not recall where it was from but thought it happened at school. J.M. denied that Father ever drove fast or played loud music in the car. She said they sometimes walked to school.

A social worker interviewed the principal for a third time. The principal reiterated that he had had problems with Father's attitude, and something seemed "off" about him, but again denied ever seeing Father mistreat J.M. To the contrary, the principal said Father treats J.M. "well." The social worker asked the

7

principal if he had ever seen Father walk J.M. to school, and he said no, indicating that Father is always in his car "with the music blasting."

Father left a voicemail for the social worker later that day. As transcribed in the social worker's report, Father said: "You went and saw [J.M.] today. I'm like disgusted with this, this is [the most] disgusting thing I ever heard of and you're doing it. Okay, if you want to do it. Just come and hire an attorney. I can't take this anymore. You're going somewhere that's so stupid, I've never seen embarrassing me in front of my school. And doing all this so I'm ready to sue you, so let's it." (*Sic.*)

Father submitted a urinalysis for drug testing on Thursday, December 2, 2021, at 3:41 p.m. Father tested positive for alcohol with a level of 71 mg/dL. The lab technician informed the social worker that this was equivalent to a 0.07 blood alcohol concentration (BAC), one hundredth below the per se impaired level for driving under California law. (See Veh. Code, § 23152, subd. (b).) Although there is no explicit statement in the record, the parties do not dispute that Father drove to the testing site. When confronted with the test results, Father told the social worker he is "old enough to drink alcohol and . . . does not have an issue with drinking alcohol. . . . [H]e was not willing to enroll in any substance abuse program and was not willing to stop drinking alcohol."

On these facts, DCFS obtained an order from the juvenile court authorizing J.M.'s removal and detention. She was placed in the home of paternal grandmother.

DCFS filed this petition with the juvenile court, alleging one count for failure to protect under section 300, subdivision (b). The petition alleged: "[Father] has a history of substance abuse

and is a current abuser of alcohol, which renders the [F]ather incapable of providing regular care and supervision of [J.M.]. On prior occasions, . . . [F]ather was under the influence of alcohol while [J.M.] was in . . . [F]ather's care and supervision. On [December 2, 2021], . . . [F]ather had a positive toxicology screen for alcohol. [J.M.] is a former dependent of the [j]uvenile [c]ourt, due to the [F]ather's substance abuse. The [F]ather's substance abuse endangers [J.M.'s] physical health and safety and places [J.M.] at risk of serious physical harm, damage, and danger."

The juvenile court scheduled a combined adjudication and dispositional hearing for January 2022. DCFS filed a combined jurisdictional and dispositional report, detailing further developments with the family since J.M. was detained. The social worker again interviewed J.M., who reported that Father was visiting her at paternal grandmother's house. She repeated that she had no "worries or concerns to report about father," and that she was "not afraid" of him. That being said, J.M. was conflicted about whether she preferred to live with paternal grandmother or with Father. She noted that Father "drinks 'white wine . . . to make him feel better.' " When asked about this statement, J.M. said she had heard paternal grandmother and another person say at a court hearing that "[her] dad drinks white wine."

The social worker interviewed paternal grandmother a second time. She acknowledged Father drinks two glasses of wine some nights after J.M. goes to sleep but denied he has an alcohol problem. She also denied that he had an anger management issue. She explained that he, like all men in his family, is "loud," attributing this to their Persian Iranian heritage. She reported that Father was "really upset" and

9

confused by the DCFS's intervention with the family. Paternal grandmother reiterated that Father does not mistreat J.M., and that Father and J.M. have a loving relationship.

Finally, the social worker spoke to Father shortly before the hearing. Father was confrontational and argumentative, refusing to discuss the sustained allegations in the prior petition or Father's positive test for alcohol. The social worker told Father she was concerned about Father's sobriety and that Father should not have been drinking at all given the prior DCFS case. Father maintained his legal right to drink. He refused further drug tests, even though the juvenile court ordered random testing on December 22, 2021. It is apparent from the social worker's report that Father was rude and combative as he called the social worker names and spoke in a baby voice when the social worker tried to discuss the current allegations.

At a combined jurisdictional and dispositional hearing, the juvenile court sustained the allegations, and found that removal was warranted by clear and convincing evidence. In stating the factual basis for sustaining the allegations, the juvenile court stated: "[F]ather has an anger management issue. [¶] He may have an alcohol issue. [¶] He clearly has challenges regulating his emotions. [¶] He has an explosive demeanor. [¶] He is inappropriate with school officials, parents and the social workers and neighbors. [¶] He refuses to cooperate. [¶] He refused to cooperate with [DCFS], which gives the court no insurance that he would make this child available or cooperate with family maintenance." The juvenile court noted: "I think the challenge in this case is that the [F]ather has not cooperated, which might be appropriate because he is mad about [DCFS] being involved, but the fact that this is a petition that is very, very similar to the

other petition, in spite of [F]ather having engaged in programming, the fact that he appears to have a hard time regulating his emotions, his language and behavior with [DCFS], his refusing to cooperate with testing, his expressive behavior to the school, his neighbors, to the social worker, all seem to indicate that there is a problem.  [¶]  We might have had more information that the [F]ather cooperated and we could have determined this is an alcohol issue.  [¶]  It could be mental health because he says he drinks alcohol to make himself feel better."

The juvenile court removed J.M. from Father's custody and placed her under DCFS supervision.  It ordered reunification services, mental health counseling, a psychological assessment, anger management, individual counseling, and random drug testing.

Father appealed.

## DISCUSSION

### I.    Standard of Review

We review the juvenile court's jurisdictional findings under section 300 for substantial evidence.  (*In re Natalie A.* (2015) 243 Cal.App.4th 178, 184.)  We will uphold the juvenile court's findings " 'unless, after reviewing the entire record and resolving all conflicts in favor of the respondent and drawing all reasonable inferences in support of the judgment, we determine there is no substantial evidence to support the findings.' "  (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1022.)  " ' "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." ' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

We review the juvenile court's dispositional findings and order for substantial evidence, keeping in mind the heightened

11

requirement of proof by clear and convincing evidence. (*In re V.L.* (2020) 54 Cal.App.5th 147, 154–155.) We must determine "whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995–996.)

## II.  DCFS failed to meet its burden to show a nexus between Father's conduct and any risk of harm to J.M.

Section 300, subdivision (b)(1), subjects a child to juvenile court jurisdiction if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . .  [¶] . . . [t]he failure or inability of the child's parent or guardian to adequately supervise or protect the child" or "[t]he inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse." (*Id.,* subd. (b)(1)(A) & (D).)

"A jurisdictional finding under section 300, subdivision (b)(1), requires DCFS to demonstrate the following three elements by a preponderance of the evidence:  (1) neglectful conduct, failure, or inability by the parent; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness." (*In re L.W.* (2019) 32 Cal.App.5th 840, 848.) Section 300 requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing. (*In re J.N.* (2021) 62 Cal.App.5th 767, 775.) However, the " ' "court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child." ' " (*In re S.R.* (2020) 48 Cal.App.5th 204, 219.)

12

Evidence of past conduct may be probative of current conditions, and may assist DCFS in meeting this burden. (*In re D.L.* (2018) 22 Cal.App.5th 1142, 1146.) Nonetheless, DCFS must still establish a nexus between the parent's past conduct and the current risk of harm. (See *In re Roger S.* (2018) 31 Cal.App.5th 572, 583). "To establish a defined risk of harm at the time of the hearing, there 'must be some reason beyond mere speculation to believe the alleged conduct will recur.' " (*In re D.L.*, at p. 1146.)

Here, the juvenile court found Father had "an anger management issue" and "may have an alcohol issue," creating a substantial risk to J.M.'s safety, protection, and emotional well-being. Father contends that substantial evidence does not support the juvenile court's finding that he abuses alcohol or that there was a current substantial risk that J.M. would suffer serious physical harm or illness as defined by section 300, subdivision (b)(1). We find this latter argument persuasive.

As an initial matter, DCFS has not established a sufficient nexus between Father's purported anger management issue and any harm or risk of harm to J.M. J.M. felt safe with Father and told social workers that Father punished her appropriately. While the school principal expressed concerns about Father's attitude towards him and other parents, he described J.M. as easygoing, well-adjusted, and happy. The principal never observed any concerning behavior with respect to Father towards J.M. and reported that Father treats J.M. "well." While some of the family's neighbors heard yelling coming from the family's apartment, they had never seen or heard anything that indicated J.M. was subject to abuse or neglect.

13

Next, even if we assume substantial evidence supports the juvenile court's finding that Father is a current abuser of alcohol, there is no evidence in the record to support a finding that Father's conduct has resulted in an inability to provide regular care to J.M. or that his behavior has caused J.M. substantial harm or placed her at risk of suffering substantial harm.

Our case law dictates that drug use or substance abuse, without more, is an insufficient basis to assert dependency jurisdiction . (*In re L.W.*, *supra*, 32 Cal.App.5th at p. 359; see also *In re Drake M.* (2012) 211 Cal.App.4th 754, 769 [drug use without evidence that use has caused or will cause physical harm is insufficient to support jurisdiction]; *In re Rebecca C.* (2014) 228 Cal.App.4th 720, 728 (*Rebecca C.*) [substance abuse without more is insufficient to support jurisdiction].)

*Rebecca C.* is instructive. (*Rebecca C.*, *supra*, 228 Cal.App.4th 720.) After receiving a welfare referral that parents were abusing drugs in the home, DCFS investigated the referral and found that mother had a long history of drug abuse and was a current abuser of drugs. (*Id.* at pp. 722–724.) Mother reported that she had been using drugs since she was a teenager, and tested positive for methamphetamine, amphetamine, and marijuana on the day DCFS responded to the referral. (*Ibid.*) However, with respect to the child, DCFS was only able to conclude that she performed poorly at school but was otherwise healthy and cared for. (*Ibid.*) The juvenile court sustained the allegations that mother's substance abuse endangered the child's physical health and safety, and placed the child at risk of physical harm and damage. (*Id.* at p. 724.)

The appellate court found that, while substantial evidence supported a finding that mother was a current substance abuser,

it reversed the juvenile court's jurisdictional orders because DCFS failed to meet its burden to show that mother's substance abuse had caused or was causing a substantial risk of harm to the child. (*Rebecca C.*, *supra*, 228 Cal.App.4th at p. 727.) It rejected DCFS's argument that a child is placed at risk when a parent uses methamphetamine, amphetamine and marijuana because those substances were "well recognized to be substances which cause hallucinogenic or stimulant-driven behavior." (*Id.* at pp. 727–728.) The court reasoned that accepting DCFS's argument would mean that physical harm to a child is *presumed* when a parent is a substance abuser. (*Id.* at p. 728.) The court noted that this would essentially shift the burden to the parent to prove a negative, which "is not what the dependency law provides." (*Ibid.*; see also *In re Destiny S.* (2012) 210 Cal.App.4th 999, 1004–1005 [mother's marijuana use, without more, was insufficient to assert jurisdiction]; *In re David M.* (2005) 134 Cal.App.4th 822, 830 [same]; *In re L.C.* (2019) 38 Cal.App.5th 646, 654 [father's methamphetamine use, without more, was insufficient to support jurisdiction].)

Here, there is less evidence than in *Rebecca C.* and other cases that held that a parent's substance abuse without any accompanying harm or risk of harm to the child is insufficient to assert jurisdiction. When DCFS first contacted Father during an unannounced visit, the social worker found that the family home was clean and tidy, adequately furnished, stocked with sufficient food, contained age-appropriate toys, and the utilities were in working order. There was no indication of alcohol abuse or that Father was exposing J.M. to his purported alcohol abuse. Moreover, by all accounts, J.M. and Father had a good relationship and there was no evidence that Father was failing to

15

adequately supervise or protect her or provide regular care. J.M.'s pediatrician reported that J.M. was current on her physicals and vaccinations, and had no concerns of abuse or neglect.

While J.M.'s school principal expressed concerns about Father's attitude, he was unable to describe any examples of abuse or neglect and reported that Father was appropriate with J.M. Indeed, the principal's primary complaint about Father was his conduct in the valet line when he was picking up J.M. from school. Specifically, the principal was concerned because other parents had complained that Father drove erratically, played loud music, and made other parents feel uncomfortable.

Likewise, two of the family's neighbors observed that Father had a good relationship with J.M. and had never seen any signs of abuse. With respect to those neighbors who were concerned about loud noises and yelling coming from the family's apartment, there was no evidence that Father's disruptive conduct was harming or creating a substantial risk of harm to J.M.

The dissent reasons that the neighbor who called law enforcement, claiming to have heard J.M. telling Father to "stop touching her underwear," which led to the DCFS referral, supports the juvenile court's finding that J.M. was at a substantial risk of harm. However, no other witness corroborated that statement, and there was no evidence of sexual abuse that would support an inference that the statement was accurate. Indeed, the dissent acknowledges that it was reasonable to assume that the neighbor misheard the statement through the wall, and DCFS made no allegations of sexual abuse in any event.

16

DCFS argues that the jurisdiction and removal were appropriate here because the record shows that Father lied about the extent of his alcohol use, drank a few glasses of wine nightly while J.M. was asleep but still in his care, and drove a vehicle during the afternoon with a 0.07 BAC. Given these facts, and Father's prior history of alcohol abuse, DCFS argues that it is reasonable to assume that Father could not refrain from drinking alcohol during the day. While the fact that Father was not forthcoming about his alcohol use and his positive test are concerning, DCFS has not pointed to any evidence in the record that Father's alcohol use was harming or creating a substantial risk of harm to J.M.

DCFS appears to argue that Father's positive test for alcohol on a Thursday afternoon supports an inference that Father may have driven drunk with J.M. in the car because he dropped J.M. off with paternal grandmother just 40 minutes before he submitted a urine sample, which showed a 0.07 BAC. This inference assumes too much. First, it is undisputed that Father was under the legal limit when he tested. Thus, there is no evidence that Father was under the influence per se. (See Veh. Code, § 23152, subd. (b).) Nor was there evidence that Father was driving unsafely when he drove to the testing site or earlier in the day when he drove J.M. to paternal grandmother's home. While it is unlawful for an individual to operate a vehicle under the influence regardless of their blood alcohol concentration, there was no evidence that Father was driving unsafely before his test such that it can be inferred that he was under the influence when he drove with J.M. earlier that day or when he drove to the test. Second, we do not agree with the dissent's assumption that Father must have been driving above

17

the legal limit. While Father's positive urine sample certainly reflects that he drank alcohol, it is not necessarily reflective of when Father drank. The only alcohol test here is below the legal limit, and without further context, we cannot assume that he drove above the legal limit just before his test.

On the record before us, it appears that Father's only issues were that he was loud, obnoxious, disturbed his neighbors and other parents at J.M.'s school, and then tested below the legal limit for alcohol. None of these issues harmed J.M. or placed her at a substantial risk of harm and were thus insufficient for asserting jurisdiction.

Because we find that the juvenile court erred in asserting jurisdiction over J.M., Father's challenges to the dispositional orders are moot. (See *In re Destiny S.*, *supra*, 210 Cal.App.4th at p. 1005.)

## DISPOSITION

The juvenile court's jurisdictional and dispositional orders are reversed.


VIRAMONTES, J.


I CONCUR:


STRATTON, P. J.


18

**B317841**
*In re J.M.; Los Angeles County Department of Children and Family Services v. H.M.*
**GRIMES, J., Dissenting.**

I respectfully dissent.

I disagree with the majority that the evidence supporting jurisdiction was insubstantial. In my view, substantial evidence supports the conclusion that father H.M. abuses alcohol and that his abuse puts his daughter J.M. at risk of physical harm. Our responsibility on review of a jurisdictional order is to determine if substantial evidence, contradicted or uncontradicted, supports the findings. (*In re Natalie A.* (2015) 243 Cal.App.4th 178, 184.) We must review the evidence in the light most favorable to the juvenile court's order, drawing every reasonable inference and resolving all conflicts in favor of the prevailing party. (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545.) I think the majority disregards this fundamental principle and, instead, reweighs the evidence; in some cases, disregarding substantial evidence favorable to the juvenile court's order.

As to alcohol abuse, we have recognized that a parent's dishonesty about substance use is sufficient to support the inference the parent is hiding substance abuse. (See *In re K.B.* (2021) 59 Cal.App.5th 593, 601 ["The juvenile court was entitled to conclude the mother had been transparently dissembling about her drug use. A reasonable inference was the mother was trying to hide her ongoing addiction. The trial court was entitled to draw this reasonable inference."].)

Here, father repeatedly lied about his alcohol use. He initially told the Los Angeles County Department of Children and

Family Services (Department) he "does not drink alcohol." This proved not to be true when later he admitted "he drinks a few glasses of wine nightly." But even this concession did not reveal the whole story. When he underwent testing for drugs and alcohol at 3:41 p.m. on a Thursday, he had the equivalent to a 0.07 percent blood-alcohol level. Whether father had residual alcohol in his system from the night before or had been drinking the day of his test, neither is consistent with his claim of drinking just a few glasses of wine at night. Moreover, father refused further testing and refused to stop drinking alcohol.

On the afternoon that father tested positive for alcohol, he had dropped J.M. off at paternal grandmother's house about 40 minutes earlier. Father refused to explain his positive alcohol test except to say he was "old enough to drink." From the record, the juvenile court was entitled to presume that father drove J.M. to paternal grandmother's house after drinking and then drove to the testing center. It was further entitled to presume from his 0.07 percent blood-alcohol level test at 3:41 p.m. that it was higher, and that he was under the influence when he drove J.M. approximately 40 minutes earlier. Reports of erratic driving at J.M.'s school and father's irascibility in the school pickup line that led the principal to question whether father was "on something" further support the inference that father drives under the influence.

Father also has a history of DUI's and other driving, drug, and alcohol offenses. Father observes that his most recent criminal conviction was in 2005—long before J.M. was born. That father has not been more recently charged with or convicted of DUI does not negate the substantial evidence supporting the

2

inference that he drove under the influence on the day of his drug test during the Department's investigation.

Finally, I must specifically disagree with the majority's contention that, "[w]ith respect to those neighbors who were concerned about loud noises and yelling coming from the family's apartment, there was no evidence that Father's disruptive conduct was harming or creating a substantial risk of harm to J.M." The majority simply ignores that one neighbor reported hearing J.M. telling father to "stop touching her and . . . her underwear" and asking father, "[w]hy [are you] doing this?" And it ignores a firsthand law enforcement account from the prior case that Father's yelling was connected to his drinking and frightened the child. As the majority recites in its background section, "[p]olice were called to the family apartment [when J.M. was four years old] following a neighbor's report that Father was inside yelling and screaming, which included a statement that he was going to 'kill.' When police arrived, they heard Father 'ranting and screaming' and 'making strange noises.' Father initially denied that he had been ranting and screaming, and claimed that he had been asleep. However, when the officers told him that they heard him making noises from outside the apartment, Father 'began laughing and joking.' The officers entered the apartment and found multiple open beer cans while J.M. was sitting on her bed, clutching a blanket, and ' "scared out of her mind." ' "

It would not be unreasonable to infer the underwear comment was unreliable—a neighbor mishearing things through a wall. It would not be unreasonable to infer that J.M. was " 'scared out of her mind' " when her intoxicated father yelled not because he was ranting about killing but because of the presence

of law enforcement in her bedroom late at night.  But the standard of review requires that we draw inferences from the evidence that support the juvenile court's judgment, however much we might disagree with it, and conclude that father's alcohol use caused him to engage in behavior that endangered J.M.

GRIMES, J.

4