Filed 2/7/19; Certified for Publication 2/28/19 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re L.W., a Person Coming Under the Juvenile Court Law. | B290992 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 18CCJP02446A) |
| Plaintiff and Respondent, | |
| v. | |
| S.Y., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Kristen Byrdsong, Referee.  Affirmed.

Annie Greenleaf, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kristine P. Miles, Assistant County Counsel, and Brian Mahler, Deputy County Counsel, for Plaintiff and Respondent.

# INTRODUCTION

Mother asked her physician to help her stop using cocaine. Based on Mother's admitted drug abuse, allegedly in front of her 13-year-old daughter, Mother's physician referred the family to the Department of Children and Family Services (DCFS). The primary question presented is whether the juvenile court correctly asserted jurisdiction over mother and daughter based on mother's admitted use of cocaine and a reckless driving conviction mother sustained shortly before the dependency proceedings commenced; the answer is yes. We therefore affirm the juvenile court's orders.

## FACTUAL AND PROCEDURAL BACKGROUND

On March 16, 2018, DCFS received a referral regarding Mother's ongoing use of cocaine to treat her chronic body pain. According to the referral, Mother smoked crack cocaine in her home in front of her then 13-year-old daughter L.W., who would complain to Mother about this conduct. The reporting party was a physician at Kaiser Permanente, whom Mother had asked for help in treating her drug use.

Later that same day, a DCFS social worker went to the family home to investigate. The social worker noted that the home appeared clean and had all the basic necessities. L.W.'s two adult siblings, Brittany and Brandon, also resided in the family home in separate bedrooms. The social worker found no drugs or drug paraphernalia in the home.

The social worker interviewed Mother, L.W., and maternal aunt Doris[1] separately. Mother told the social worker that she suffered from several medical problems, including chronic sciatica and hypertensive peristalsis, a condition that causes the esophagus to contract and made Mother feel "like she was having a heart attack every single day." To treat these ailments, Mother stated she took a myriad of prescription and over-the-counter medication, including but not limited to Norco, Valium, Ibuprofen, and Tylenol. Mother stated she would ingest her medication with a "shot of vodka" every day for the past year, because the alcohol served "as a catalyst" for the drugs to take effect.

Mother said she started using cocaine six months prior, after a friend suggested to her that cocaine would help with her mobility issues. Mother continued to use cocaine because it "helped her walk, cook, clean, and be [a] functional parent." She stated she generally used the drug every other day, or when she had "money for it." Mother denied ever using cocaine in front of L.W. or in the family home and stated that she never kept cocaine in the home. She said she only smoked it at her friend's home and that her most recent cocaine use was three days earlier, on March 13, 2018.

Mother explained she sought help from a doctor at Kaiser Permanente with her medication and cocaine use, as she wished to "cleanse her body" and "detox." Mother told the social worker that there was no need for DCFS intervention, as she no longer

---

[1] Although the record reflects that maternal aunt's name is Doris, Appellant refers to her as "Danielle" throughout Appellant's opening brief.

3

wanted to use drugs and alcohol. The social worker requested that Mother submit to a voluntary drug test that same day; however, Mother refused, saying she already disclosed the drugs and medication she used, rendering the testing unnecessary. Mother then indicated she would be willing to test a few days later, when "everything is flushed out of her system." Mother requested that the social worker keep Mother's drug abuse private as her family would be "very disappointed" in her if they learned about her drug use.

The social worker created a safety plan for Mother. As part of this safety plan, Mother agreed to refrain from using cocaine and alcohol and to enroll in a substance abuse program and submit to drug tests, with the results available to DCFS. Mother also agreed to allow L.W.'s maternal aunt Doris and adult sibling Brittany to assist in supervising L.W.

That same day, the social worker interviewed L.W., who stated she felt safe with Mother and denied any concerns about Mother's parenting. L.W. said either she or one of her adult siblings would assist Mother when she experienced pain as a result of her ailments. They would bring Mother her meals and/or medication. L.W. said she never saw Mother use drugs.

Maternal aunt Doris was "shocked" to hear of DCFS's involvement and denied any concerns about Mother's mental health or substance use. Doris described Mother as "a great parent to L.W." Similarly, L.W.'s adult siblings, Brandon and Brittany, both stated they had no concerns about Mother's use of drugs or alcohol and described Mother as a "good" parent who "loves her children to [the] core." Both Doris and Brittany stated they helped Mother in caring for L.W. and driving her to and from school when Mother's ailments prevented her from doing so.

4

Brittany stated she is a "home body" who makes sure L.W. showers every morning and has food or a ride to school  She has never seen Mother drinking and then driving.

On March 19, 2018, the social worker called Mother to follow up on the status of her drug tests, but Mother stated she no longer wanted to submit to on-demand drug and alcohol testing.

On April 6, 2018, the social worker contacted Mother again, who reported she was unable to enroll in a substance abuse program because the program would not accommodate her medical needs.  Mother stated she would participate in an outpatient program but had "no ride" to the class.  The social worker assessed Mother as having low insight about the safety concerns and negative impact her substance abuse would have on L.W., and found L.W. to be at "high risk" for general neglect.  The social worker believed Mother struggled with understanding that her mixture of prescription drugs, cocaine, and alcohol could be detrimental to her health, as well as the safety of L.W.

On April 10, 2018, the social worker interviewed Father, who lives separately and is not a party to his appeal.  Father denied any concerns of Mother's substance use and stated he had "never seen [M]other under the influence of any drugs or alcohol." Father explained that there is no family law order in place regarding L.W.  He is still "very involved" in L.W.'s life in that he takes L.W. to school every morning and Mother picks L.W. up from school thereafter.  L.W. spends time at his house and will have overnight visits.  He explained L.W. never disclosed to him any concerns about her mother.

On April 11, 2018, Mother informed the social worker by telephone that she had not used cocaine or alcohol since the social worker came to her home on March 16.

DCFS then learned of Mother's criminal history spanning from 1993 until as recently as late 2017. In October 2017, six months before the DCFS referral, Mother was arrested and charged with driving under the influence (DUI) of alcohol and reckless driving. As a result, she was convicted of reckless driving. Six months earlier, in March 2017, Mother had been arrested and charged with another DUI and convicted of an unknown misdemeanor offense. In 2013, she was arrested for possession of paraphernalia and battery on a police officer; she was convicted of the latter charge. In 2005, she was convicted of disturbing the peace. In 1996 and 1997, she successfully completed diversion after being charged for possession of controlled substances. In 1993, she was charged with resisting arrest and convicted of presenting false identification to a peace officer.

A.    *The Petition*

On April 16, 2018, DCFS filed a petition alleging L.W. came within the jurisdiction of the juvenile court under section 300, subdivision (b)(1) of the Welfare & Institutions Code.[2] The petition alleged that Mother is a "current abuser" of cocaine and a "frequent user" of alcohol with prescription medication, rendering Mother "incapable of providing regular care and supervision" of L.W. and placed L.W. at risk of danger and serious physical harm. The petition also alleged that in 2018,

---

[2]    All further references are to the Welfare and Institutions Code, unless otherwise indicated.

Mother was under the influence of illicit drugs, alcohol, and prescription medication while L.W. was in Mother's care and supervision.

DCFS filed the detention report on April 17, 2018 and requested court services for Mother to ensure she followed up with treating her substance abuse and to ensure L.W.'s safety.

On April 17, 2018, both Mother and non-offending Father appeared at the detention hearing. Mother denied the allegations on the petition. The court found a prima facie showing had been made that L.W. was a minor described by section 300, subdivision (b)(1). The court found it would be detrimental to the child not to be subject to DCFS supervision, but found several measures could be put in place so that L.W. need not be removed from Mother's custody, as Mother "has been very forthcoming and wants to receive the necessary help." The court ordered DCFS to make frequent unannounced home visits and ordered Mother to submit to on-demand testing. Mother indicated she was "in talks" with the House of Uhuru, an outpatient substance abuse program. The court ordered DCFS to provide referrals to Mother for additional outpatient substance abuse programs.

After the April 17 detention hearing, DCFS continued to supervise Mother. On May 4, 2018, Mother's toxicology results tested positive for cocaine.

On May 15, 2018, the social worker interviewed Mother again. Mother stated that she last "used cocaine about 8 months ago." Mother provided the social worker with prescriptions for her medication, except for three that she was unable to locate. Mother stated she had previously smoked "a marijuana joint laced with cocaine." The social worker asked Mother how often

she used cocaine, and Mother said she "only did it 3 times" but never in the home or in L.W.'s presence.

On May 29, 2018, DCFS spoke with a social worker with Kaiser Permanente, who stated Mother disclosed to her physician that she was a regular user of cocaine. When asked how often she used cocaine, Mother had told the Kaiser Permanente social worker that she used cocaine "daily," and that she often used cocaine in the family room in L.W.'s presence. Mother's medical records indicated she had been using illicit drugs for the past two years.

On May 31, 2018, the social worker learned that Mother failed to enroll in the substance abuse program at the House of Uhuru and had not participated in the scheduled intake.

B. *Adjudication*

During the combined jurisdictional and disposition hearing on June 28, 2018, the court received into evidence the detention report, filed April 17, 2018, and the jurisdictional/disposition report dated June 11, 2018. The court also took judicial notice of all prior orders and findings.

Mother requested the court dismiss the dependency petition for a "lack of evidence" and "lack of nexus" between Mother's "substance use and any kind of neglect or abuse of the child." She argued there is "absolutely no evidence, whatsoever, to indicate that this child has or will ever be at risk of any abuse or neglect." Further, Mother contended there was nothing in the record to suggest that L.W. was being neglected or abused in any way; in fact, L.W. was "doing well" in school, did not have any "attendance problems," and L.W. herself reported to DCFS that Mother always takes care of her, and cleans and cooks "almost every night." Mother alluded to the fact that there was "full

family support" in helping care for L.W. and/or taking L.W. to and from school.

DCFS and minor's counsel both asked the court to sustain the petition as alleged. DCFS stated its "strongest evidence" against Mother was Mother's "self-report of daily cocaine use." DCFS argued the "fact that [Mother's] family doesn't or didn't know about her cocaine use on a daily basis in and of itself is concerning because it shows that she's a functioning drug abuser." Based on Mother's previous drug-related arrest, a DUI, her daily use of various drugs, and her driving L.W. to and from school, DCFS believed there was a substantial nexus between Mother's substance abuse and the risk of harm to L.W.

Minor's counsel reminded the court that Mother continued to test positive for cocaine even after Mother knew of DCFS's ongoing investigation and even after the detention proceedings were held. Minor's counsel argued that Mother's substance abuse, her "changing story as to her cocaine use," and her taking "shot[s] of vodka . . . as a catalyst" along with cocaine and prescribed medication put L.W. at substantial risk of serious harm. Minor's counsel stated that Mother was using an illicit drug that has "addictive qualities and makes a person act irrationally if . . . they take too much of it," and that Mother's addiction could put L.W. "at risk" at any point.

The court found by a preponderance of the evidence that the section 300(b)(1) count was true as alleged and that L.W. was a person described by section 300, subdivision (b)(1). The court found by clear and convincing evidence that L.W. could remain in the home of Mother "on the condition that Mother comply with

9

the case plan."[3]  The court stated, "Given that [Mother] had a positive test after detention and given there's conflicting stories of [Mother's] drug use, I think [Mother] really do[es] need a full [drug and alcohol] program to address this issue and get [Mother] the help [she] need[s] so [she] can be the kind of mom that I'm sure [Mother] want[s] to be."

Mother timely appealed.

## DISCUSSION

Mother contends the evidence does not support the juvenile court's exercise of jurisdiction over L.W. on the ground that Mother's substance abuse caused or will cause a substantial risk of harm to L.W.  Mother also contends the juvenile court abused its discretion when it declared L.W. a dependent of the court rather than ordering informal supervision of the family.

A.     *Substantial Evidence Supports the Juvenile Court's Jurisdictional Finding.*

In reviewing a challenge to the sufficiency of the evidence supporting jurisdictional findings and related dispositional orders, we "consider the entire record to determine whether substantial evidence supports the juvenile court's findings." (*In re T.V.* (2013) 217 Cal.App.4th 126, 133; accord, *In re I.J.* (2013) 56 Cal.4th 766, 773.)  "Substantial evidence is evidence that is 'reasonable, credible, and of solid value'; such that a reasonable trier of fact could make such findings.  [Citation.]" (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199.)

---

[3]     The record does not contain the juvenile court's case plan. We understand the case plan ordered by the court to be the same as the one recommended by DCFS in the jurisdictional report.

10

Section 300, subdivision (b)(1), authorizes a juvenile court to exercise dependency jurisdiction over a child if the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child, or . . . by the inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness, developmental disability, or substance abuse." (§ 300, subd. (b)(1).) A jurisdictional finding under section 300, subdivision (b)(1), requires DCFS to demonstrate the following three elements by a preponderance of the evidence: (1) neglectful conduct, failure, or inability by the parent; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness. (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 561; *see also In re R.T.* (2017) 3 Cal.5th 622, 624.)

It is undisputed that there was no evidence of and no specific finding of past harm to L.W. as a result of Mother's substance abuse. L.W. stated she never saw any drugs or paraphernalia at home, never saw Mother abuse drugs and felt safe living with her Mother. She was well-fed, groomed, and regularly attended school. All percipient witnesses and family members agreed Mother was a good parent to L.W. and all denied having concerns about Mother's abilities as a mother. While not denying her substance abuse, Mother argues there is no nexus between it and any substantial risk of harm to L.W. There was "no reason to believe the family was unable to handle Mother's substance abuse issues as there was strong family in-home and out-of-home support."

11

The legislature has declared, "The provision of a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child." (§ 300.2.) The juvenile court "need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child." (*In re R.V.* (2012) 208 Cal.App.4th 837, 843.)

On the other hand, our case law stands for the proposition that drug use or substance abuse, without more, is an insufficient ground to assert jurisdiction in dependency proceedings under section 300. (*In re Drake M.* (2012) 211 Cal.App.4th 754, 769 [drug use without evidence that use has caused or will cause physical harm insufficient to support jurisdiction]; *Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, 1336–1338 [DCFS opinion that mother's use of alcohol and marijuana did not establish substance abuse]; *In re Rebecca C.* (2014) 228 Cal.App.4th 720, 728 (*Rebecca C.*) [substance abuse without more is insufficient to support jurisdiction].)

*Rebecca C.* is instructive as the facts are strikingly similar to the facts before us. Upon investigation of the referral that Rebecca's parents were using drugs and that the home was filled with guns and drugs, DCFS found nothing other than mother's lengthy and current drug abuse and Rebecca's below grade level or nonexistent school performance. (*Rebecca C.*, *supra*, 228 Cal.App.4th at pp. 722–724.) Mother had a lengthy history of drug use since her teenage years currently used methamphetamine, which she alternately denied and admitted. (*Ibid.*) She tested positive for methamphetamine, amphetamine, and marijuana on the day the social workers responded to the referral. (*Id.* at p. 722.) She had been involved in the criminal

12

court dependency court systems in the past as a result of her drug use. (*Ibid.*) She had previously enrolled in a drug program and relapsed. (*Id.* at pp. 722–723.) She rationalized her drug use as being due to the stress she was feeling as she had recently separated from Rebecca's father and their son was charged with murder. (*Ibid.*) She failed to monitor whether Rebecca was doing her homework. (*Id.* at p. 722.)

After rejecting the argument that failure to monitor homework presents a risk of physical harm, the court addressed the sole remaining basis for asserting jurisdiction – mother's substance abuse. (*Rebecca C.*, *supra*, 228 Cal.App.4th at pp. 727-728.) "DCFS next argues that methamphetamine, amphetamine and marijuana are well recognized to be substances which cause hallucinogenic or stimulant-driven behavior. DCFS argues that '[t]he risk to a child being cared for by a parent under the influence of such substances is not speculative.' We do not accept DCFS's argument. It excises out of the dependency statutes the elements of causation and harm. In other words, DCFS essentially argues that, when a parent engages in substance abuse, dependency court jurisdiction is proper. This is not what the dependency law provides. Further, if DCFS's position were accepted, it would essentially mean that physical harm to a child is *presumed* from a parent's substance abuse under the dependency statutes, and that it is a parent's burden to prove a negative, i.e., the *absence* of harm. Again, this is not what the dependency law provides." (*Ibid.*)

This is not, however, a case involving substance abuse without more. We believe there is substantial evidence in addition to Mother's substance abuse that places L.W. at substantial risk of future harm. In the year preceding the

13

commencement of DCFS's investigation, Mother was arrested twice for driving under the influence. While the disposition of one of the arrests is unknown, the most recent arrest was resolved when Mother was convicted of reckless driving. Mother's arrests and conviction of reckless driving add a new dimension to the analysis. They lead us to conclude the effect of her substance abuse is not now confined to her private moments alone. The conviction alone is evidence of substance abuse in a situation in which it is physically hazardous to do so. That there were two arrests and at least one conviction within a year of the referral shows Mother's substance abuse is now spilling over into areas that will pose a substantial risk of physical harm to L.W.

Mother had an opportunity to try to resolve the problem by enrolling in drug treatment between the referral and the combined jurisdictional/disposition hearing and did not or could not do so. We find it reasonable to infer that the safety problems posed by Mother's substance abuse will continue to multiply to Lauryn's detriment until Mother's substance abuse is resolved. The recent DUI arrests and conviction for reckless driving provide a nexus between Mother's substance abuse and a substantial risk of future harm to L.W.

B.    *The Juvenile Court Did Not Abuse its Discretion in Declaring L.W. a Dependent of the Court.*

Mother contends the juvenile court erred when it declared L.W. a dependent child because there was an available lesser alternative to dependency—namely, an order to DCFS to provide family maintenance services under section 360, subdivision (b). We disagree.

After the juvenile court finds jurisdiction pursuant to section 300, it must "adjudicate the child a dependent unless the

14

severity of the case warrants nothing more than Agency's supervision of family maintenance services. . . . [T]he court may, without adjudicating the child a dependent, order that services be provided to keep the family together under the informal supervision of the child welfare agency." (*In re N.M.* (2011) 197 Cal.App.4th 159, 171.) The court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accord with this discretion. (*In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1006.)

We cannot reverse the court's dispositional order absent a clear abuse of discretion. A court exceeds the limits of legal discretion if its determination is arbitrary, capricious or patently absurd. The appropriate test is whether the court exceeded the bounds of reason. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.)

On these facts, we cannot say the juvenile court acted **a**rbitrarily in authorizing formal supervision of the family. Mother gave conflicting stories about the length and extent of her substance abuse, successfully hid her substance abuse from her relatives so as not to disappoint them, continued to test positive for cocaine even after the detention hearing, and had not enrolled in a substance abuse program by the June 28, 2018 adjudication hearing. By her own testimony, Mother's substance abuse had spiraled from using prescription drugs to abusing a mixture of alcohol, prescription drugs, and cocaine. Although services had been offered, by the time of the adjudication, she was not yet in treatment. That the juvenile court believed formal supervision and oversight by the court would be more efficacious than informal family maintenance services is supported by Mother's

15

unfortunate downward trajectory.  We cannot find the decision arbitrary or capricious.

## DISPOSITION

The juvenile court's jurisdictional and dispositional orders are affirmed

STRATTON, J.

We concur:

GRIMES, Acting P. J.

RUBIN, J.*

---

* Presiding Justice of the Court of Appeal, Second Appellate. District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 2/28/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re L.W., a Person Coming Under the Juvenile Court Law. | B290992 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 18CCJP02446A) |
| Plaintiff and Respondent, | ORDER CERTIFYING OPINION FOR PUBLICATION [NO CHANGE IN JUDGMENT] |
| v. | |
| S.Y., | |
| Defendant and Appellant. | |

THE COURT:

The opinion in the above-entitled matter filed on February 7, 2019, was not certified for publication in the Official Reports. For good cause, it now appears that the opinion should be published in the Official Reports.

[There is no change in the judgment.]

_____

GRIMES, Acting P. J.          STRATTON. J.          RUBIN, J.*

_____

\*       Presiding Justice of the Court of Appeal, Second Appellate. District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.