Filed 10/3/25  In re G.B. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re G.B. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E085430 |
| Plaintiff and Respondent, | (Super.Ct.No. DPRI2400484) |
| v. | ORDER MODIFYING OPINION |
| E.B., | [NO CHANGE IN JUDGMENT] |
| Defendant and Appellant, | |
| A.B., Defendant and Respondent. | |

The opinion filed in this matter on September 18, 2025, is modified as follows:

On page one, opinion's caption, delete "et al., Defendants, Appellant and Respondent" and add "Defendant and Appellant."

1

On page one, opinion's caption, below "E.B., Defendant and Appellant," add "A.B., Defendant and Respondent."

Except for these modifications, the opinion remains unchanged.  The modification does not effect a change in the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON

J.

We concur:


MILLER

Acting P. J.


RAPHAEL

J.

Filed 9/18/25 In re G.B. CA4/2 (unmodified opinion)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re G.B. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E085430 |
| Plaintiff and Respondent, | (Super.Ct.No. DPRI2400484) |
| v. | OPINION |
| E.B. et al., | |
| Defendants, Appellant and Respondent. | |

APPEAL from the Superior Court of Riverside County. Caryl A. Lee, Judge.

(Retired Judge of the Orange Super. Ct. assigned by the Chief Justice pursuant to art. VI,

§ 6 of the Cal. Const.) Affirmed.

Marisa L.D. Conroy, under appointment by the Court of Appeal, for Defendant

and Appellant E.B.

1

Rich Pfeiffer for Defendant and Respondent A.B.

Minh C. Tran, County Counsel, Teresa K.B. Beecham and Julie Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

## I.

## INTRODUCTION

Appellant E.B. (Father) and respondent A.B. (Mother) are the parents of 15-year-old G.B., 14-year-old A.B., and nine-year-old P.B. Father appeals from the jurisdictional and dispositional findings. On appeal, Father contends there was insufficient evidence to support the jurisdictional allegations against him and that the juvenile court should have terminated jurisdiction after placing the children in his care. We reject these contentions and affirm the judgment.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

The family came to the attention of the Riverside County Department of Public Social Services (DPSS) in October 2024 with allegations of general neglect and emotional abuse of the children after Mother and her live-in boyfriend engaged in domestic violence while two of the children were home. It was alleged that Mother and her boyfriend had been drinking and got into an argument, and the boyfriend destroyed items in the home. Specifically, while Mother was out of the home, the boyfriend ripped the camera out of the front door, smashed the television, threw items off the shelf, and slashed Mother's car tires. Mother returned home and the argument continued between

2

Mother and the boyfriend. Mother and the boyfriend went upstairs, and G.B. witnessed the boyfriend bang his head onto a dresser until it was bloody. G.B. heard the boyfriend say to Mother that he was going to tell the police that she did this to him, and witnessed the boyfriend cover Mother's mouth with his hand during the incident. G.B. also saw the boyfriend straddling Mother. Mother eventually called law enforcement and the boyfriend was arrested for misdemeanor domestic violence. The boyfriend, however, later returned to the home.

At the time of the incident, Mother and Father were in the processing of getting a divorce. The court awarded joint legal and physical custody of the children to Mother. Father was granted visitation by mutual agreement of the parties. Father was in an inpatient rehabilitation facility at the time being treated for alcohol abuse.

G.B. confirmed the allegations to the social worker. When asked if he felt safe in the home, G.B. stated that he kept to himself and stayed in his room. When asked again if he felt safe in the home, G.B. asserted that he no longer wanted to speak with the social worker. During the interview, G.B.'s demeanor switched from one of reluctance in talking to the social worker to showing signs of trauma and emotional distress. G.B. paused several times to hold back tears while answering questions, and he often stiffened his body and wiped his eyes before continuing to speak. After completing the interview, the social worker requested a crisis counselor from the school speak to G.B. as the social worker was concerned for his emotional wellbeing.

3

The social worker also spoke with A.B. regarding the allegations.  A.B. said she was not present for the domestic violence incident because she was visiting her father.  A.B. was aware that the boyfriend had been arrested, and she confirmed that he returned to the home since his arrest.  When asked if there had been similar previous incidents of domestic violence between Mother and the boyfriend, A.B. stated that she did not want to talk about it and ended the interview.

The social worker attempted to speak with P.B. at her school, but P.B. had been removed early from school by Mother and the boyfriend.  The social worker eventually made contact with P.B. at her school.  P.B. said she lived with her mother and siblings, and she visited Father on the weekends.  P.B. noted that she was present during the domestic violence incident between Mother and the boyfriend, but she was not willing to share what she witnessed during the incident.

The social worker left Father a voicemail requesting a return call.  The paternal grandfather called the social worker back and told her that Father was in a substance use disorder inpatient rehabilitation program.  Father only had access to his phone for a limited time each day, and the paternal grandfather would relay the message to him to contact the social worker.

Mother informed the social worker that she had been in relationships with domestic violence, but that she never reported the incidents.  Mother said that "'nothing happened'" with her boyfriend and denied any physical violence.  When told that G.B. appeared traumatized by the domestic violence incident, Mother explained that G.B. and

4

his siblings had witnessed Father engage in acts of domestic violence towards her and that was why G.B. responded as he did. Mother denied ever reporting any of the domestic violence perpetrated by Father. Mother admitted that the boyfriend removed her cameras, threw items from a shelf, broke a television, and slashed her car tires. Mother asserted that she had no reason to be concerned about the boyfriend's behavior and agreed to participate in a safety plan with DPSS. She also agreed that she and the boyfriend would not be together in the children's presence without a responsible adult present. On October 31, 2024, G.B. and A.B. told the social worker that the boyfriend was at their home all of the time.

According to the police report of the September 29, 2024, domestic violence incident between Mother and her boyfriend, Mother alluded to the boyfriend breaking her ribs the week prior by kneeing her in the chest. The boyfriend informed law enforcement that he and Mother had been cohabitating for two months and were having a verbal argument. The boyfriend was asked about the damage to Mother's bedroom door, and the boyfriend claimed that Mother's prior boyfriend caused the damage.

On November 1, 2024, Father made contact with the social worker. He was on disability and said he was currently in an inpatient rehabilitation treatment center for alcohol usage. He stated that he was concerned that his alcohol intake was becoming an issue and had checked himself into a residential program. Upon release from the program, he planned to go directly into a sober living facility. He acknowledged the family law orders and stated that he typically saw the children on the weekends. Father

5

indicated that he was aware that the children were exposed to domestic violence, but he was not aware of the details. The social worker explained the details of DPSS's investigation and that the boyfriend had returned to the home. Father said that the children had expressed that the boyfriend was mean and yelled a lot. He added that he did not know much about the boyfriend, but the children had expressed a dislike for him.

On November 6, 2024, the social worker asked Father if he considered applying for emergency family law orders to bring the children to his care. Father was willing to do so, but after subsequently speaking with his attorney he learned that there were some procedural issues which meant that the earliest he would be in court was November 13, 2024. Father had family members who were willing and available to care for the children. Father was willing to do whatever was necessary to ensure the children's safety, but at that time he was committed to his inpatient program for alcohol use. Due to Mother's refusal to follow the safety plan, on November 9, 2024, the children were removed from Mother's care and custody and transported to Father's home.

On November 13, 2024, a petition was filed on behalf of the children pursuant to section 300, subdivision (b)(1) (failure to protect). As to Father, allegation b-2 of the petition alleged that Father "knew or reasonably should have known that the children were being exposed to a hostile home environment due to the domestic violence incidents between the mother and her boyfriend" and that Father "failed to intervene in the protection of the children, placing the children at risk of serious injury, neglect, and/or

abuse." Allegation b-3 of the petition alleged that Father had a history of abusing alcohol.

On November 14, 2024, the juvenile court formally detained the children from Mother's custody. The children remained in Father's custody under family maintenance services and were placed in his home. The children were in the care of Father, and the paternal grandfather lived in the same home and assisted with the care of the children.

The social worker met with P.B. on November 26, 2024. She said that Mother and the boyfriend argued a lot, but she never saw them fight with their hands. She indicated that the police had been to her home three times while the boyfriend lived with them. Two of the police visits were due to the boyfriend and Mother arguing, and the third time was because she was home alone. G.B. informed the social worker that the boyfriend was aggressive towards Mother and that prior to the most recent incident, Mother and the boyfriend argued and the boyfriend yelled a lot. G.B. could hear Mother and the boyfriend arguing from his room. Once G.B. walked into the garage and the boyfriend had his hand on Mother's neck. The boyfriend also slammed doors in the home causing them to chip.

On November 21, 2024, Father reported that he did not know about the domestic violence in the home. He explained that he did not learn of any of the domestic violence in Mother's home until the boyfriend was arrested and the investigating social worker informed him of the incident. He was made aware that Mother had broken some ribs prior to the boyfriend's arrest and that was the only incident he was made aware of. G.B.

7

told Father that the boyfriend had ripped the camera, broke the television, and slashed Mother's tires. Father was aware that the children were scared and had run to the neighbor's house during the incident. Father had been informed that the boyfriend made bail the day he was arrested and that the day the boyfriend was released, Mother, P.B., and the boyfriend went out of town and left the two older children at home. The older children had asked Father for money to buy food. Father stated that this was not a new occurrence, that the children are often left home alone, and that he had called law enforcement in the past but Mother would come home prior to law enforcement's arrival.

Father lived at a sober living home and had completed 34 days of inpatient treatment. The sober living program was anywhere from four to five weeks, and he had been in the program for two weeks. He had previously completed a program two years earlier and explained that he would drink quite a bit of alcohol after he and Mother separated. He moved in with the paternal grandfather who encouraged Father to become sober. After a while, he began to drink again, and began his current treatment program on October 3, 2024. According to Mother, Father had a problem with methamphetamine and not alcohol. Mother indicated that Father had been to a rehabilitation program three times within the year and a total of 11 times during the duration of their relationship. Mother minimized the domestic violence incident between her and the boyfriend, claimed she did not want to press charges against the boyfriend or obtain a restraining order against him, and continued to allow the boyfriend to reside in her home.

The jurisdictional/dispositional hearing was held on January 3, 2025. DPSS's counsel argued the juvenile court should sustain the petition, remove the children from Mother with reunification services, and place the children with Father under family maintenance services as Father's alcohol abuse program was four to five weeks long and Father had been in the program for two weeks. Mother's counsel requested return of the children to her custody as she continued to be actively engaged in all of her services and was cooperating with the social worker. Mother's counsel noted that Mother had called the police during the domestic violence incident, had a restraining order and was seeking a permanent restraining order against the boyfriend, Mother was engaged in domestic violence services, and Mother had documentation as to her enrollment as well as letters written by her therapist that contained glowing reviews in her ability to learn and understand the devastating consequences of domestic violence.

Father's counsel argued that there was insufficient evidence to support the allegations against him in the petition, noting "Father's history of alcohol abuse is not the reason why [the] case is here." Father's counsel further pointed out that Father and Mother had been separated for some time and Father did not have contact with Mother and had no information regarding domestic violence. Father supported the imposition of a permanent restraining order and the prosecution of the boyfriend. DPSS's counsel submitted on the allegations against Father, noting the parents had been separated for two years and Father was in a sober living facility when DPSS opened the investigation. DPSS did not believe that it would be in the best interest of the family to close the case

9

and grant Father sole physical custody. The children's counsel requested the court sustain the petition as the domestic violence was serious and the children were present. As to Father, the children's counsel argued while Father's participation in seeking treatment for his alcohol abuse was commendable, it was not resolved. The children's counsel agreed that keeping the case open with a plan of family maintenance was appropriate to allow the children to transition to living with Father.

The juvenile court found true the allegations in the petition. The court noted that the domestic violence was extreme, the children were witnesses to it, and scientific evidence shows children are physically damaged by witnessing domestic violence. As to Father, the court noted that "there was, at least, some knowledge of all of this DV behavior that Father got wind of at some point" and that "there's work that can be done" by Father. The court declared the children dependents of the court, ordered family maintenance services for Father and reunification services for Mother. The court concluded that it believed it was "too early to close" the case with the "little fine tuning" that was still happening. The court issued a permanent restraining order against the boyfriend, protecting Mother and the three children. Father timely appealed.

III.

DISCUSSION

A. *Jurisdictional Findings*

Father contends there was insufficient evidence to support the allegations that he knew or reasonably should have known the children were exposed to domestic violence

10

in Mother's home, that he had a history of abusing alcohol, and that his alcohol use affected his ability to provide regular care to his children.

Section 300, subdivision (b)(1), "provides that a juvenile may be adjudged a dependent of the court when '[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of any of the following:  [¶] (A) The failure or inability of the child's parent or guardian to adequately supervise or protect the child. . . .  [¶]  (D) The inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or *substance abuse*.' " (*In re N.R.* (2023) 15 Cal.5th 520, 537-538 (*N.R.*); see *In re R.T.* (2017) 3 Cal.5th 622, 626-627; *In re M.D.* (2023) 93 Cal.App.5th 836, 848; *In re S.F.* (2023) 91 Cal.App.5th 696, 712 (*S.F.*); *In re L.W.* (2019) 32 Cal.App.5th 840, 848 (*L.W.*).)

"A court 'need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child.'  [Citation.]  And a parent's ' " '[p]ast conduct may be probative of current conditions' if there is reason to believe that the conduct will continue." ' [Citation.]" (*In re S.F.*, *supra*, 91 Cal.App.5th at pp. 712-713.)  " 'The purpose of dependency proceedings is to prevent risk, not ignore it.' " (*Jonathan L. v. Superior Court* (2008) 165 Cal.App.4th 1074, 1104.)  However, ' "[t]o establish a defined risk of harm at the time of the hearing, there 'must be some reason beyond mere speculation to believe the alleged conduct will recur.' " ' (*S.F.*, at

11

pp. 712-713; see *In re J.A.* (2020) 47 Cal.App.5th 1036, 1048 (*J.A.*); *L.W.*, *supra*, 32 Cal.App.5th at p. 849.)

The social service agency bears the burden to demonstrate the following three elements: "(1) neglectful conduct, failure, or inability by the parent; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness." (*L.W.*, *supra*, 32 Cal.App.5th at p. 848.) " 'The basic question under section 300 is whether circumstances at the time of the hearing subject the minor to the defined risk of harm.' " (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1022.)

" ' " 'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings . . . , we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." ' " ' " (*In re S.F.*, *supra*, 91 Cal.App.5th at p. 713; see *L.W.*, *supra*, 32 Cal.App.5th at p. 848; accord, *In re Dakota H.* (2005) 132 Cal.App.4th 212, 228 ["The [order] will be upheld if it is supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence."].) " 'The parent has the burden on appeal of showing there is insufficient

12

evidence to support the juvenile court's order.' " (*In re L.B.* (2023) 88 Cal.App.5th 402, 411-412; see *In re M.C.* (2023) 88 Cal.App.5th 137, 151; *In re E.E.* (2020) 49 Cal.App.5th 195, 206.)

### 1. Allegation b-2

The b-2 allegation as found true against Father here stated that, "The father knew or reasonably should have known that the children were being exposed to a hostile home environment due to the domestic violence incidents between the mother and her boyfriend. The father failed to intervene in the protection of the children, placing the children at risk of serious injury, neglect and/or abuse." We find that substantial evidence supports the juvenile court's true finding as to the b-2 allegation. The record indicates that the social worker here first made contact with Father on November 1, 2024. At that time, Father indicated that he was aware that the children were exposed to domestic violence, but he was not aware of the details. Father stated the children had expressed that Mother's boyfriend was mean and yelled a lot and that the children indicated a dislike for the boyfriend.

Father first had contact with the social worker one month after the domestic violence incident between Mother and her boyfriend. Nonetheless, Father had yet to intervene to protect the children even though he was aware the children were exposed to domestic violence. He failed to intervene despite also being aware that Mother had left the older children at home after the domestic violence incident and knowing the children had asked Father for money. Father did not seek to apply for emergency family law

13

orders until prompted to do so by the social worker and he was not able to get into court until November 13, 2024.

Father's arguments to the contrary attack the credibility of the evidence. However, as noted above, issues of fact and credibility are the province of the trial court alone. (*In re I.J.* (2013) 56 Cal.4th 766, 773 (*I.J.*).) "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. " '[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate].' " " (*Ibid*., citations omitted.) Father's attack on the credibility of the evidence or disagreement with the evidence does not show the juvenile court's true finding on allegation b-2 against Father should be reversed. Sufficient evidence supports the court's jurisdictional finding that Father knew or reasonably should have known that the children were being exposed to a hostile home environment.

In addition, Father's argument is based on an inaccurate recitation of the facts in the record. He states that he could not have been aware of the September 29, 2024, domestic violence incident between Mother and her boyfriend because he was in a treatment program and G.B. told the social worker that he had not spoken with Father due to the treatment program. However, according to the record, Father was not in the treatment program on September 29, but had entered his treatment program four days later on October 3, 2024.

14

Moreover, G.B. informed Father that Mother's boyfriend straddled Mother and covered her mouth with his hand. G.B. also informed Father that Mother's boyfriend had ripped the Ring camera, broke the television, and slashed Mother's tires and that the children were scared and ran to the neighbor's house. The children had also disclosed to Father that they did not like Mother's boyfriend. Father was also informed that the day Mother's boyfriend was arrested he had made bail and that the day he was released Mother and her boyfriend went out of town and left the two older children at home and the older children were asking Father for money to buy food. Father noted that this was not a new occurrence, and he had called law enforcement in the past, however Mother would return home prior to law enforcement's arrival. The evidence suggests that the older children were in communication with Father around the time of the domestic violence incident. Perhaps he did not know the full extent of Mother's domestic violence incidents with her boyfriend, however, given the communication close in time to the domestic violence incident along with knowing the children did not like the boyfriend and he was mean and yelled a lot, Father reasonably should have known about Mother's hostile home environment.

We note Father's reference to the September 29th domestic violence incident as being the "sole" domestic violence incident between Mother and her boyfriend is an inaccurate description of the record. Mother "repeatedly" insinuated that her boyfriend had broken her ribs by " 'kneeing' " her a week prior to the September 29th incident.

15

And Father had been made aware that Mother had broken some of her ribs prior to the boyfriend's arrest.

Substantial evidence shows that Father knew or reasonably should have known the children were being exposed to a hostile home environment due to the domestic violence between Mother and her boyfriend. "The trial court is in the best position to determine the degree to which a child is at risk based on an assessment of all the relevant factors in each case." (*In re Drake M.* (2012) 211 Cal.App.4th 754, 766.) Considering the record as a whole in the light favorable to the court's determination, we conclude a reasonable trier of fact could have found Father knew or reasonably should have known the children were being exposed to a hostile home environment due to domestic violence between Mother and her boyfriend.

### 2. Allegation b-3

Father also challenges the juvenile court's true finding as to allegation b-3. The b-3 allegation as found true stated Father "has a history of abusing alcohol" and that the children suffered, or there was a substantial risk that the children would suffer, serious physical harm or illness "by the inability of the parent . . . to provide regular care for the child due to the parent's . . . substance abuse."

A juvenile court may assert dependency jurisdiction over a child if the child "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of" a parent's "inability . . . to provide regular care for the child due to the parent's . . . substance abuse." (§ 300, subd. (b)(1)(D).) As pertinent here, this

16

requires the department to prove "as separate elements, that (1) substance abuse (2) makes a parent or guardian unable to provide regular care for a child and (3) this inability has caused the child to suffer serious physical harm or illness or creates a substantial risk of such harm or illness." (*N.R.*, *supra*, 15 Cal.5th at p. 558; see *In re N.M.* (2011) 197 Cal.App.4th 159, 165 [juvenile court "need not wait until a child is seriously abused or injured to assume jurisdiction"].) The Supreme Court has interpreted section 300, subdivision (b)(1)(D), "as assigning the term 'substance abuse' its ordinary meaning—essentially, the excessive use of drugs or alcohol." (*N.R.*, at p. 551; see *ibid*. [neither "a diagnosis by a medical professional" nor "satisfaction of the prevailing criteria for a substance use disorder as specified within the Diagnostic and Statistical Manual of Mental Disorders (DSM)" is "essential under section 300(b)(1)(D)"].)

Substantial evidence supported the court's finding Father had a history of abusing alcohol which impaired his ability to adequately and appropriately parent his children. On November 1, 2024, Father informed the social worker that he was in a rehabilitation treatment program for alcohol abuse. Father stated that he was concerned his alcohol intake was becoming an issue, and he therefore checked himself into a residential program. The social worker spoke with Father again on November 21, 2024, and at that time, Father reported he had completed 34 days of the inpatient treatment program and was residing in a sober living home. He had been in the sober living home for two weeks, and the program was from four to five weeks long. The last time Father had completed a program was two years prior. Father explained that he drank quite a bit of

17

alcohol after he separated from Mother and that he had moved into the paternal grandfather's home who had encouraged him to become sober. After a while Father began to drink again, and he entered the most recent program on October 3, 2024.

On November 26, 2024, Mother reported that Father had a problem with methamphetamine and not alcohol. She reported that he had been to rehabilitation programs three times within the year and a total of 11 times during the duration of their relationship. While commendable of Father to voluntarily seek treatment, by the time of the jurisdictional hearing, Father was still residing in his sober living home and had yet to tackle his years-long substance abuse issues and to safely protect his children.

Father asserts that there was no evidence that his alcohol use in any way affected his ability to provide regular care for the children. However, according to the record, Father was aware that the children were exposed to domestic violence, and he was aware that the children were left at home alone and needed money for food, yet he did not intervene to protect the children. He even stated that the children being left home alone to fend for themselves was "not a new occurrence" and that he had called law enforcement in the past. Substantial evidence shows that Father was unable to provide regular care due to his alcohol abuse. (See *In re I.J.*, *supra*, 56 Cal.4th at p. 773 [" 'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings . . . , we determine if substantial evidence, contradicted or uncontradicted, supports them.' "].) The juvenile court could reasonably infer Father required additional time to battle his years-long alcohol abuse based on his recent entry into a sober living

18

home and failure to intervene when the children were being neglected by Mother. (See *N.R.*, *supra,* 15 Cal.5th at p. 559 [courts may "discern an inability to provide regular care and a substantial risk of serious physical harm or illness from the evidence that has been introduced in a particular case . . . and the reasonable inferences that can be drawn from this evidence"].)

As previously noted, "[a] court 'need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child.' [Citation.] And a parent's ' " '[p]ast conduct may be probative of current conditions' if there is reason to believe that the conduct will continue." ' [Citation.]" (*In re S.F.*, *supra*, 91 Cal.App.5th at pp. 712-713; see *In re J.A.*, *supra*, 47 Cal.App.5th at p. 1048; *In re L.W.*, *supra*, 32 Cal.App.5th at p. 849.) There is substantial evidence to support the b-3 allegation that Father had a history of abusing alcohol which impaired his ability to provide regular care for the children due to his alcohol abuse.

We note that in dependency matters, as a general rule, " ' "[a]s long as there is one unassailable jurisdictional finding, it is immaterial that another might be inappropriate." ' " (*In re D.P.* (2023) 14 Cal.5th 266, 283; accord *In re Alexis E.* (2009) 171 Cal.App.4th 438, 451 ["a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence," without considering the adequacy of the evidence in support of "other alleged statutory grounds for jurisdiction"].) "Additionally, '[b]ecause the juvenile court assumes jurisdiction of the

19

child, not the parents, jurisdiction may exist based on the conduct of one parent only.' " (*In re B.H.* (2024) 103 Cal.App.5th 469, 480, quoting *In re A.R.* (2014) 228 Cal.App.4th 1146, 1150.) "In other words, once it is determined that jurisdiction was properly assumed based on one parent's conduct, 'we need not consider jurisdictional findings based on the other parent's conduct.' " (*In re B.H.*, *supra*, at p. 480.)

Here, the jurisdictional findings as to the children that Mother "neglects the health, safety, and well-being of the children in that she minimizes the impact of domestic violence has upon her children and continues to engage in an abusive relationship with her boyfriend" (allegation b-1) are incontestable. Thus, the juvenile court had jurisdiction over the children on that basis, and Father has not argued otherwise on appeal.

B. *Dispositional Order*

Father also argues that, because there was not an ongoing need for supervision, the juvenile court should have terminated jurisdiction after placing the children with Father.

Father challenges the juvenile court's decision to continue supervision after placing the children with him on family maintenance pursuant to section 361.2. Section 361.2 provides in pertinent part that when a juvenile court removes a child from a parent, it "shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that

20

placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd. (a).)

Once a child is placed with the non-custodial parent, the court has three options: "(1) Order that the parent become legal and physical custodian of the child. The court may also provide reasonable visitation by the noncustodial parent. The court shall then terminate its jurisdiction over the child. . . . [¶] (2) Order that the parent assume custody subject to the jurisdiction of the juvenile court and require that a home visit be conducted within three months. . . . [¶] (3) Order that the parent assume custody subject to the supervision of the juvenile court. In that case the court may order that reunification services be provided to the parent or guardian from whom the child is being removed, or the court may order that services be provided solely to the parent who is assuming physical custody in order to allow that parent to retain later custody without court supervision, or that services be provided to both parents, in which case the court shall determine, at review hearings held pursuant to Section 366, which parent, if either, shall have custody of the child." (§ 361.2, subd. (b).)

" ' "The juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accordance with this discretion." ' " (*In re A.J.* (2013) 214 Cal.App.4th 525, 536.) Particularly under section 361.2, the discretion of the juvenile court is "very broad," and the question is whether there is a need for continued court supervision. (*In re Sarah M.* (1991) 233 Cal.App.3d 1486, 1496, disapproved on another ground by *In re Chantal S.* (1996) 13

21

Cal.4th 196, 204; see *In re Austin P.* (2004) 118 Cal.App.4th 1124, 1129 (*Austin P.*) [court may not terminate jurisdiction "until it analyzes whether ongoing supervision of the child is necessary"].) We review the court's decision for abuse of discretion, reversing only if the decision " ' "has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination." ' " (*In re Jaden E.* (2014) 229 Cal.App.4th 1277, 1288; see *Austin P.*, at p. 1135.)

Here, the juvenile court acted within its discretion in continuing supervision pursuant to section 361.2. The court ordered that Father was to retain physical custody of the children subject to the department's supervision. The court found that it was too early to close the case and recognized that everyone seemed motivated. The court noted that the parents may have been on track to close the matter sooner rather than later, but some "fine tuning" was still needed.

The children had been living with Mother for several years. And while the children visited with Father on weekends, G.B. noted he had not heard from Father or visited Father in a while as Father was in "rehab." Father had a long history of substance abuse and was still residing in a sober living home at the time of disposition. Father had a driving under the influence charge from 2007 and admitted he had completed a rehabilitation program two years earlier but that he required another in-treatment program again. Mother claimed that Father had been in a rehabilitation program a total of 11 times during the duration of their relationship. By the time of the dispositional hearing, Father had recently completed a rehabilitation program and was still residing in a

22

sober living home. Meanwhile, the children were being taken care of by the paternal grandfather. There was evidence that Father knew of Mother's domestic violence issues with her boyfriend, but did not intervene to protect the children. There was no evidence to suggest Father and Mother had a cordial relationship following their divorce. In addition, the record shows that G.B. showed signs of trauma and emotional distress and the social worker requested a crisis counselor from the school speak with G.B. as the social worker was concerned for his emotional well-being. Against this backdrop, the juvenile court was legitimately concerned about placing the children with Father without continued court supervision and it was reasonable for the court to conclude that terminating the dependency at the dispositional hearing was premature.

The court in *Austin P.* affirmed the continuation of supervision under similar facts. (*Austin P.*, *supra*, 118 Cal.App.4th at p. 1134.) The child in that case was detained from the mother due to her substance abuse and placed with his noncustodial father pursuant to section 361.2. (*Austin P.*, at p. 1128.) The court maintained supervision over the child, and the appellate court found substantial evidence supported that decision. (*Id.* at p. 1134.) As in the case before us, that evidence included a need to monitor the child's transition into the father's home because they had only "sporadic contact over the past 10 years"; a need to "monitor the conflict among the adults"; concern that the father had been aware of the mother's abuse and neglect but had not protected the child; concern about ensuring the child was adequately protected in the father's care; and concern about the relationships among the parents. (*Ibid.*) There was also evidence that the child

23

needed therapy and concern that the child was more bonded with the mother than the father, the mother was the only parental figure the child had known, and the mother had been making good progress in her reunification plan. (*Ibid*.)

As in *Austin P*., we find the record here amply supported the court's decision to continue supervision.

IV.

DISPOSITION

The juvenile court's jurisdictional and dispositional orders are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

<u>CODRINGTON</u>

J.

We concur:

<u>MILLER</u>

Acting P. J.

<u>RAPHAEL</u>

J.

24