Filed 4/1/26  In re B.H. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re B.H., a Person Coming Under the Juvenile Court Law. | B341526 |
| | Los Angeles County Super. Ct. No. 18CCJP07160E |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| J.M., | |
| Defendant and Appellant. | |

APPEAL from findings and orders of the Superior Court of Los Angeles County, Cristina Gutierrez Legaspi, Judge. Affirmed.

Gina Zaragoza, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jessica Buckelew, Deputy County Counsel, for Plaintiff and Respondent.

_____

## INTRODUCTION

J.M. (Mother) argues substantial evidence does not support the juvenile court's finding that her marijuana use placed her son B.H. at a substantial risk of serious physical harm at the time of adjudication. Mother also contends substantial evidence does not support the finding that she and L.H. (Father) were unable to provide ongoing care and the basic necessities of life to B.H. due to their simultaneous incarceration for murder.

We conclude substantial evidence supports the juvenile court's findings. Because Mother did not raise any challenge to the dispositional orders other than her challenge to the underlying jurisdictional findings, we affirm the dispositional orders as well.

## FACTUAL AND PROCEDURAL BACKGROUND

Mother has one child with Father: B.H., born April 2024.

Mother has two other children, L.F. (born October 2017) and T.F. (born October 2018), who are half-siblings to B.H.

Father is not a party to this appeal.

### A.     *Prior Juvenile Dependency Case History*

This family first came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) in 2017.

In October 2017, Mother gave birth to L.F. She admitted to using marijuana two weeks prior to L.F.'s birth and has a history of marijuana use.

In October 2018, Mother gave birth to T.F. and tested positive for marijuana during delivery. Mother admitted using marijuana every two months for the previous two to three years.

2

She admitted she had an open DCFS case for a positive drug screening with her first child L.F.

On November 6, 2018, DCFS filed a Welfare and Institutions Code[1] section 300 petition on behalf of L.F. and T.F. The children were detained from their parents.

On November 26, 2018, a caller stated that law enforcement observed Mother buying marijuana while L.F. was with her in a stroller.

On December 7, 2018, the juvenile court dismissed the petition without prejudice and began a contract for voluntary supervision of the family per section 301.

On October 30, 2019, a caller reported general neglect of T.F. and L.F. The caller said the home was dirty and observed roaches crawling around an unkempt home, which smelled of marijuana.

On December 10, 2019, DCFS filed a section 300 petition on behalf of L.F. and T.F., alleging Mother placed two-year-old L.F. in a detrimental and endangering situation by exposing the child to 60-degree weather with no clothing or shoes. L.F. was wearing only a diaper. Law enforcement responded to a radio call where Mother was observed chasing her baby out toward the street. Officers observed Mother's home to be a "disheveled, foul-smelling home with urine and feces on the floor." The stove was filthy, with no fresh food in the refrigerator and no beds in the home. The children were extremely dirty. T.F. had "large amounts of nasal secretion, and a bad cough." The petition alleged Mother kept a home environment that endangered the

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

children and placed them at risk of serious harm. The petition also alleged Mother's history of substance abuse, including methamphetamine, and current abuse of marijuana rendered her incapable of providing the children with regular care and supervision and endangered their physical health and safety.

On July 2, 2020, the juvenile court sustained the petition. On March 16, 2021, reunification services were terminated. On April 1, 2022, the court granted legal guardianship of L.F. and T.F. to a non-relative foster caregiver.

B.    ***Events Leading to the Current Petition***

Sometime in 2022, Mother and Father met and began a relationship. They moved together to an apartment in Los Angeles. In March 2024, Mother and Father moved to Las Vegas, Nevada. A few weeks later, they were arrested for murder.

Mother gave birth to B.H. in April, 2024, while she was incarcerated in Las Vegas. Mother tested positive for marijuana at birth and B.H. was "identified as being affected by fetal alcohol spectrum disorder and/or parental substance use and/or as having withdrawal symptoms resulting from prenatal drug exposure." Three days later, Mother was transported back to jail while B.H. was detained by the Department of Family Services (DFS) in Clark County, Nevada. He was temporarily placed with a resource family approved caretaker in Las Vegas. Mother and Father were later extradited to Los Angeles. On June 6, 2024, the Los Angeles Superior Court asserted jurisdiction over B.H. after determining California B.H.'s appropriate home state.

On June 6, 2024, DCFS received a referral reporting general neglect and caretaker absence by Mother and Father towards B.H. The referral stated B.H.'s parents lacked resources to provide for B.H., including stable housing and income. B.H.

4

"was born substance exposed" and Mother admitted to daily marijuana use throughout her pregnancy.

On June 12, 2024, a children's social worker (CSW) interviewed Mother at the Lynwood Detention Center in Los Angeles County. Mother stated she wanted B.H. placed with paternal aunt (PA) Latasha, "who has been trying to get in contact with the Las Vegas social workers since child was detained." Mother did not want B.H. placed with his foster caretaker because Mother "does not have the best relationship with her."

Mother stated she smoked marijuana "approximately 4–5 times a month" before going to jail. She used methamphetamines about eight years ago. She reported that B.H. "was not born with fetal alcohol syndrome because she never drank alcohol during her pregnancy." She denied alcohol consumption as she was "born with a medical condition w[h]ere she has seizures that she takes medication for and cannot use alcohol." Mother did not receive any prenatal care before going to jail because she felt it was not necessary.

On June 13, 2024, the CSW interviewed Father at Men's Central Jail. The CSW noted Father appeared to have "some developmental delays based on his speech." Father stated he wanted B.H. placed with PA Latasha. Father has been in a relationship with Mother for two and one-half years and they "get along very well." He knew Mother used marijuana once a week while she was pregnant.

On June 14, 2024, the CSW contacted PA Latasha, who resides in Lompoc, California with her two minor children and two adult children. PA Latasha stated she was willing and able to take custody of B.H. She had "been trying to get in contact

with the social workers in Las Vegas since the child has been detained however no one has returned her calls." PA Latasha reported no concerns for Mother and was unaware of her substance use. She stated Father was diagnosed with developmental delays as a minor. She was aware of the charges against Mother and Father.

On June 20, 2024, the CSW contacted the social worker (SW) assigned to the family's case in Las Vegas. The SW stated Father had random outbursts during the interview where he would "scream, cry, mumble under his breath and hit himself in the head." Mother had reported to the SW that "prior to being incarcerated she smoked 2 blunts of marijuana a day to control her anger." Mother disclosed she had a history of psychiatric hospitalizations and was prescribed medication but did not take it because she "doesn't like the way it makes her feel." She admitted to methamphetamine use but could not recall when or how often she used. The SW visited Mother and Father's address in Nevada after they were incarcerated and looked through a broken window. She observed the condition of the home was "not bad as there were just clothes thrown around."

The CSW also spoke with B.H.'s previous caretaker who stated B.H. displayed "withdrawal symptoms" and would "cry incessantly, unable to self-soothe and had slight tremors." She had taken B.H. to a doctor, who advised that "those behaviors could be the result of [B.H.] being exposed to substances while in the womb." The caretaker reported B.H.'s tremors progressively decreased.

6

On June 21, 2024, the CSW flew to Las Vegas to retrieve B.H.  He was placed with PA Latasha in Lompoc.

C.    *Petition and Detention*

On June 25, 2024, DCFS filed a section 300 petition on behalf of B.H.  Counts b-1 and b-2 allege Mother and Father are unable to provide the child "with ongoing care, supervision and the basic necessities of life including . . . food, shelter, clothing and medical care."  Mother delivered the child while both parents are incarcerated and awaiting trial for murder, without bail.  These circumstances endanger "the child's physical and emotional health and safety and place[] the child at risk of serious physical and emotional harm and damage."  Count b-1 pertained to Mother and count b-2 pertained to Father.[2]

Counts b-5 and j-2 allege Mother has a "history of substance abuse including methamphetamine and is a current abuser of marijuana," which interferes with her care of B.H., who is "of such young age as to require constant care and supervision."  Mother abused marijuana while pregnant with B.H.  Father knew of Mother's substance abuse and failed to take action and protect B.H.  On December 5, 2019, Mother possessed marijuana and several open containers of alcohol in the home and within access of B.H.'s half-siblings L.F. and T.F.  His half-siblings are "current dependents" of the juvenile court and are receiving permanent placement services due to Mother's substance abuse.  Her substance abuse endangers B.H.'s physical health and safety and places him at risk of serious physical harm.

---

[2]    We do not address dismissed counts b-3, b-4, and j-1 which are not subjects of this appeal.

7

On June 28, 2024, both parents appeared at the initial detention hearing. The juvenile court found a prima facie case that B.H. is a person described by section 300. The court detained B.H. and placed him with PA Latasha under DCFS supervision. DCFS was ordered to assess two plans—"the feasibility of parents working out an appropriate plan [of care] with the paternal aunt" as well as the appropriateness of placing B.H. in the home of his half-siblings. The court stated Mother's participation in domestic violence, anger management, and parenting programs in her custodial facility would facilitate reunification with B.H. The court ordered DCFS to set up weekly visits for B.H. with his parents and monthly visits with his half-siblings.

D. *DCFS's Continued Investigations*

On August 7, 2024, the CSW interviewed Mother at the Century Regional Detention Facility. Mother said she "periodically" visited L.F. and T.F. before her arrest. She stated, in the past she did not reunify because she was homeless and struggling to pay for classes and to support herself. She was previously ordered to drug test but "would miss tests as she was 'waiting for [her] marijuana levels to go down.'" Mother stated she abused methamphetamine for about a year when she was homeless eight years ago. Mother last used marijuana when she was four months pregnant with B.H.

The CSW interviewed Father, who stated he is aware Mother "smokes marijuana since he met her," including "smoking a blunt . . . per day. . . . [T]he blunt is usually large and she will only smoke one of those per day."

The CSW consulted with the social worker assigned to B.H.'s half-siblings' case. Their social worker reported there is an active stay-away order from the half-siblings' home as to Mother because of her behavior. Mother had used intimidation and threatened violence against the legal guardian; Mother told the legal guardian she "knows people and will have them shoot up the place." On Thanksgiving in 2022, Mother showed up to the guardian's home without notice and demanded a visit; when Mother realized a visit was not tenable, she "became destructive by kicking the trash can and slamming the gate" and "threatened to harm herself in front of the home." Mother has violated the stay-away order by showing up unannounced at the home on at least three occasions. The guardian's adult daughter reported she saw Mother " 'high as a kite' in the past year while she was pregnant with B.H."

On August 19, 2024, the CSW met with PA Latasha and B.H., who appeared healthy and was cooing and babbling. PA Latasha stated Father "unexpectedly moved to Las Vegas, NV for a 'fresh start' without telling her, which she believes could be because he was in trouble." PA Latasha expressed she is "open to providing [B.H.] with a permanent home, should the parents be unable to reunify." She agreed to take B.H. to visits with his parents in custody one or two times per month, once visitation is approved.

At a hearing on August 26, 2024, minor's counsel wanted DCFS to investigate the benefits of placing B.H. with his half-siblings instead of his PA. Mother strongly objected to B.H.'s placement with the half-siblings' legal guardian. Over Mother's objection, the juvenile court ordered DCFS to "interview and

9

address [placement with half-siblings] in the next report" but gave DCFS no discretion to remove B.H. from PA Latasha.

The half-siblings' legal guardian told DCFS that she has experienced "direct threats of violence and death" by Mother and once saw Mother and Father stand outside her home, smoke marijuana, and intimidate with violence. She knows the parents are incarcerated for murder, is afraid of them and is "currently not interested in having [B.H.] placed in her care."

E. *Adjudication*

Adjudication took place on October 15, 2024. After argument, the juvenile court found true counts b-1, b-2, b-5, and j-2 of the petition and struck the remaining counts.[3] In so ruling, the juvenile court explained it found counts b-1 and b-2 true because Mother and Father are "unable to care for this child today" and failed to adequately plan for B.H.'s care. The court noted there "was no paperwork. There was no arrangements. No letters of even temporary guardianship, not even any affidavit or notarized information to transfer care of [B.H.] to any of the relatives. [¶] What we have today is . . . court intervention, and [DCFS] intervention needed to be put in place so that appropriate care for this child can be taken." The court also found count b-5 "true because Mother has had a very long history of drug use. She admitted methamphetamine use for a very long time. There

---

[3] The minute order erroneously states that count j-2 was also dismissed. Where there is a conflict between the juvenile court's statements in the reporter's transcript and the recitals in the minute order, we presume the reporter's transcript is the more accurate statement of the court's intent. (*In re A.C.* (2011) 197 Cal.App.4th 796, 800; *In re Abram L.* (2013) 219 Cal.App.4th 452, 459, fn. 3.)

are witnesses that said 'she is high as a kite,' and Mother admitted that she used marijuana during pregnancy. That is enough of a basis." The court also found Father "had reason to know or should have known of the Mother's substance abuse. They were together as a couple, and the long history speaks for itself, and that is the same thing as [count j-2]."

The juvenile court declared B.H. a dependent of the court under section 300, subdivisions (b) and (j), and ordered B.H. removed from his parents' home and care. It found appropriate B.H.'s current placement with PA Latasha.

The court ordered family reunification services for both parents. Mother's plan required her to complete a full drug/alcohol program with aftercare, comply with random and on-demand drug/alcohol testing, participate in a 12-step program with a sponsor, a parenting program, and individual counseling. Father's plan required him to comply with random and on-demand drug/alcohol testing, participate in parenting classes, and individual counseling. The court ordered monitored visits for the parents, three times a week for three hours each.

Mother filed a timely notice of appeal.

## DISCUSSION

### A. *Mother Did Not Waive Her Right to Challenge the Juvenile Court's Jurisdictional Findings*

Mother preliminarily argues she did not waive her right to challenge the jurisdictional findings when she had "expressed a willingness to waive her right to receive reunification services, if the court were to appoint [PA Latasha] as legal guardian" at the dispositional hearing. Mother contends her willingness to waive reunification services did not nullify her efforts to contest jurisdiction.

11

DCFS agrees with Mother, and so do we. Mother's willingness to waive reunification services does not negate the fact that no such waiver was actually entered by Mother on the record. Mother has not forfeited her right to challenge the juvenile court's jurisdictional findings. (See *In re A.O.* (2015) 242 Cal.App.4th 145, 149 ["Mother's submission to the reunification services aspect of [DCFS's] recommendation did not override her vigorous efforts to contest jurisdiction and removal."].)

B. ***Substantial Evidence Supports the Juvenile Court's Jurisdictional Findings***

On appeal, Mother challenges the juvenile court's jurisdictional findings as unsupported by substantial evidence.

Where, as here, several bases of jurisdiction are challenged on appeal, "[t]he reviewing court may affirm a juvenile court judgment if the evidence supports the decision on any one of several grounds." (*In re Jonathan B.* (1992) 5 Cal.App.4th 873, 875.) "[T]he paramount purpose underlying dependency proceedings is the protection of the child." (*Id.* at p. 877.) Where one basis for jurisdiction is supported by substantial evidence, the reviewing court does not need to consider the sufficiency of evidence to support other grounds. (See *Randi R. v. Superior Court* (1998) 64 Cal.App.4th 67, 72 (*Randi R.*); see also *In re I.A.* (2011) 201 Cal.App.4th 1484, 1492 [The minor is a dependent if the actions of a parent bring the minor within one of the statutory definitions of a dependent.].) "For this reason, an appellate court may decline to address the evidentiary support for any remaining jurisdictional findings once a single finding has been found to be supported by the evidence." (*In re I.A.*, at p. 1492.)

We proceed with our review of the juvenile court's jurisdictional findings based on Mother's substance abuse (counts b-5 and j-2). We need not reach the merits of the other counts if we conclude counts b-5 and/or j-2 are supported by substantial evidence.

### 1. Standard of Review

In reviewing a challenge to the sufficiency of the evidence supporting jurisdictional findings and related dispositional orders, we "consider the entire record to determine whether substantial evidence supports the juvenile court's findings." (*In re T.V.* (2013) 217 Cal.App.4th 126, 133; accord, *In re I.J.* (2013) 56 Cal.4th 766, 773.) "Substantial evidence is evidence that is 'reasonable, credible, and of solid value'; such that a reasonable trier of fact could make such findings." (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199.) In making our determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations and we note that issues of fact and credibility are within the province of the trial court. (*In re I.J.*, at p. 773.) " ' "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." ' " (*Ibid.*)

### 2. Applicable Law

Under section 300, subdivision (b)(1), a juvenile court may assert jurisdiction over a child if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . [¶] (A) The failure or inability of the child's parent . . . to adequately supervise or protect the

13

child." (§ 300, subd. (b)(1).) A jurisdictional finding under section 300, subdivision (b)(1) requires DCFS to demonstrate by a preponderance of the evidence: (1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) serious physical harm or illness to the child or a substantial risk of such harm or illness. (*In re L.W.* (2019) 32 Cal.App.5th 840, 848.)

A child is subject to jurisdiction of the juvenile court under section 300, subdivision (j), when the "child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions." (§ 300, subd. (j).) In making such a finding, the juvenile court "shall consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent . . . , and any other factors the court considers probative in determining whether there is a substantial risk to the child." (*Ibid.*)

### 3. Analysis

We find substantial evidence supports the juvenile court's jurisdictional findings in counts b-5 and j-2—that Mother's history of substance abuse and current substance abuse render her incapable of providing B.H. with regular care and supervision and places him at substantial risk of harm pursuant to section 300, subdivisions (b)(1) and (j).

Mother's substance abuse issues with marijuana have been documented by DCFS since 2017—long before B.H.'s birth in April 2024. When Mother gave birth to half-sibling L.F. in October 2017, she admitted to using marijuana two weeks prior to L.F.'s birth. One year later, in October 2018, Mother gave birth to T.F. and tested positive for marijuana during delivery.

14

The juvenile court ordered the children detained from Mother. She admitted marijuana use for the previous two to three years and acknowledged she had an open DCFS case for a positive drug screening with her first child L.F. Despite her awareness of her substance abuse problem, it did not motivate her to stop using. (*In re T.V.*, *supra*, 217 Cal.App.4th at p. 133 ["A parent's past conduct is a good predictor of future behavior."].) B.H. was born in April 2024 while Mother was incarcerated and she tested positive for marijuana at his birth. B.H. was "identified as being affected by fetal alcohol spectrum disorder and/or parental substance use and/or as having withdrawal symptoms resulting from prenatal drug exposure." Mother admitted to daily marijuana use throughout her pregnancy.

Mother argues that mere usage of drugs is not a sufficient basis for dependency jurisdiction. Mother is correct in that regard. However, here, there is *much more* than drug use alone.

In October 2019, DCFS received reports of the state of Mother's home—crawling roaches, a dirty and unkempt home, and the smell of marijuana wafting in the air. A little over a year later, in December 2019, the juvenile court sustained a second petition filed on behalf of B.H.'s half-siblings following reports from law enforcement who observed Mother's home to be a "disheveled, foul-smelling home with urine and feces on the floor," no beds, a filthy stove, and "no fresh food in the refrigerator." B.H.'s half-siblings were extremely dirty. T.F. had a large amount of nasal secretion, and a bad cough while L.F. was found outside wearing no clothes or shoes in 60-degree weather. This resulted in Mother's 2019 conviction for child cruelty, the termination of reunification services in 2021, and custody awarded to the children's foster caregiver.

"The provision of a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child." (§ 300.2, subd. (a).) "Section 300(b)(1)(D) allows for dependency jurisdiction based on substance abuse only when this abuse leads to an 'inability' on the part of a parent or guardian 'to provide regular care for [a] child' (§ 300(b)(1)(D)) that causes the child to suffer, or creates 'a substantial risk that the child will suffer, serious physical harm or illness' (*id.*, subd. (b)(1))." (*In re N.R.* (2023) 15 Cal.5th 520, 540.)

Mother's substance abuse impeded or interfered with her ability to provide regular care and supervision of B.H.'s half-siblings, who were so young as to require constant care and supervision. The home was not only dirty with feces found on the floor and the smell of marijuana in the air, but also L.F. was found naked but for a diaper outside in cold weather and T.F. was found sick with nasal phlegm and a bad cough. The juvenile court properly considered all these factors in determining that B.H. was at present risk of serious harm from Mother's drug use. The court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child. (*In re T.V.*, *supra*, 217 Cal.App.4th at p. 133.) The juvenile court was justified in anticipating serious risk to B.H. based on Mother's unresolved drug use and the dependency history pertaining to his half-siblings.

Mother did not seek help or try to do things differently when pregnant with B.H. She tested positive for marijuana at his birth. B.H.'s first temporary caretaker stated B.H. displayed "withdrawal symptoms" and would "cry incessantly, unable to self-soothe and had slight tremors." The caretaker took B.H. to a

doctor, who advised that "those behaviors could be the result of [B.H.] being exposed to substances while in the womb." In fact, while Mother told the CSW in the underlying dependency case that she smoked marijuana "approximately 4–5 times a month" before her incarceration, she had told the Las Vegas SW that "prior to being incarcerated she smoked 2 blunts of marijuana a day to control her anger." Mother minimized and lied about the severity of her drug problem, which can be considered evidence of the severity of the problem. (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["One cannot correct a problem one fails to acknowledge."]; *In re Esmeralda B.* (1992) 11 Cal.App.4th 1036, 1044 ["denial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision"].)

We conclude that the evidence, "view[ed] . . . in the light most favorable to the juvenile court's determinations" (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 992), is sufficient to support the jurisdictional findings in counts b-5 and j-2 as to Mother. We thus need not consider the sufficiency of the evidence as to the other counts. (See *Randi R.*, *supra*, 64 Cal.App.4th at p. 72; see also *In re I.A.*, *supra*, 201 Cal.App.4th at p. 1492.)

Finally, although Mother's opening brief purports to appeal from the juvenile court's dispositional orders, she raises no argument specifically addressing disposition other than requesting its reversal based on the reversal of underlying jurisdictional findings. Because we affirm the jurisdictional findings, we also affirm the dispositional orders.

17

## DISPOSITION

The juvenile court's findings and orders are affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

STRATTON, P. J.

We concur:

WILEY, J.

SCHERB, J.